[No. C055878. Third Dist. Oct. 9, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
CURTIS BRYANT DeFRANCE, Defendant and Appellant.

488

## COUNSEL

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORRISON, Acting P. J.**—When Stephan Elaine Brophy tried to stop defendant Curtis Bryant DeFrance from stealing her son's car, defendant ran over Brophy and killed her. Defendant was convicted by jury of first degree murder (Pen. Code, § 187, subd. (a)) with a robbery special circumstance (Pen. Code, § 190.2, subd. (a)(17)) and a deadly weapon enhancement (Pen. Code, § 12022, subd. (b)(1)), robbery (Pen. Code, § 211), and vehicle theft (Veh. Code, § 10851, subd. (a)). He was sentenced to life in prison without the possibility of parole, plus one year.

In this very short murder trial, the trial court solicited a stipulation from counsel that the court reporter need not record the jury instructions. Unfortunately, the jury instructions in the clerk's transcript do not accurately reflect the instructions given to the jury. Defendant contends the absence of an accurate record of the oral instructions violates due process and the error was not cured by the attempt to settle the record. We strongly discourage the practice of not recording the oral instructions given to the jury, which practice only gives rise to the problems present in this case. We find, however, that on this record, no prejudicial error occurred.

Defendant raises other claims of error. He contends there is insufficient evidence of robbery because Brophy had no right to control her son's car and the instruction on robbery was inadequate on the issue of constructive possession. He contends the trial court erred in allowing the prosecution to dismiss a juror after the jury was agreed upon and should have been sworn. Further, he contends the court abused its discretion in imposing a $10,000 restitution fine and erred in imposing a parole revocation fine in a case where no parole is possible.

We accept the Attorney General's concession that the parole revocation fine was imposed in error, and otherwise affirm the judgment. We find

sufficient evidence of robbery. There was sufficient evidence from which the jury could conclude Brophy had a special relationship with her son to support a finding she had control over his property. While the jury instruction provided little assistance in determining the issue of control, the omission was harmless in this case.

## FACTS

Stephan Elaine Brophy lived in a condominium owned by her mother. Two of her adult children, Tristan and Kendrick Holliday, lived with her. The condominium had three bedrooms, but Kendrick usually slept in the living room. The bottom floor had a sliding glass door that opened to a patio. The patio was surrounded by a six-foot fence. A gate in the fence led to the parking lot.

The condo had two designated parking spaces, one of which was covered. Both Tristan and Kendrick had cars. Brophy did not own a car, but sometimes used Tristan's car; she did not use Kendrick's car. Kendrick usually parked in the shaded spot. At the time of the crime, Brophy was using Tristan's car and had parked in the shaded spot, which she preferred, so Kendrick parked in the second, or guest, spot.

Kendrick owned a Toyota Tercel. He bought the car for $2,400 in cash. His mother and grandparents helped him pay for it. The car had recently been stolen and vandalized. Minors had taken it for a joyride and trashed it. The steering column had been damaged and Kendrick used a screwdriver to start the car. The locks were difficult to work, so he did not lock it.

The car was registered in Kendrick's name. His mother was listed on the insurance "just in case," but she never drove it. She borrowed the car once or twice but was afraid to tell her son because the car was hard to drive and he would worry. Kendrick let his sister drive the car once when she was learning to drive a stick shift, but for the most part, only he drove it.

On the morning of July 10, 2005, Tristan was out of town visiting her father and Kendrick was asleep in the living room. Neighbors heard voices in the parking lot. They heard a woman yelling, "get out of that car," and then screeching tires.

When the police arrived, Brophy was on her back in the center of the parking lot. A gelatin-like fluid was coming out of her right ear and there was a tire mark across her torso. There was a skid mark in the street.

That morning J.B. was leaving the Beverages & more! store on Sunrise Boulevard when he saw a light-colored Tercel speed down the road and make

an illegal U-turn. He had just picked up his daughter from a nearby hospital and she mentioned someone was brought in with a broken skull. He thought the speeder might be connected to that, so he contacted the police. J.B. identified defendant as the driver and selected his picture from a lineup.

The Tercel was found shortly after noon in the North Highlands area. Crime scene investigators processed the car and found defendant's palm print on the driver's window.

T.E., a convicted felon with a long criminal history, testified someone named Curtis came to the apartment where he was staying. Curtis said he had been trying to steal some lady's car and he ran over her because she tried to stop him. T.E. was in jail facing a drug felony, with two strikes. The charge was reduced to a misdemeanor. The parties stipulated T.E. received no consideration for his statements or testimony.

Mark Super, a forensic pathologist, performed an autopsy on Brophy. She was five feet six inches tall and weighed 264 pounds. She had a large abrasion on the right side of her head, a tripolar laceration on the back of her head and a fractured skull. She had a subdural hematoma, bruising over her body, and a fractured right ankle. The cause of death was blunt force head, thoracic, and right leg injuries. The injuries were consistent with being run over. The most significant injury medically was to the head.

David Dowty, a member of the California Highway Patrol Multidisciplinary Accident Investigation Team and a certified expert in collision reconstruction, gave an opinion as to what happened. In his opinion, Brophy was behind the car when it backed up and hit her. She fell to the ground, striking her head, and the car ran over her. Based on the skid marks, Dowty believed the car had accelerated rapidly. The driver would have been able to feel the impact.

In 2000, Officer Jason Warren stopped defendant when he was speeding. The car he was driving was stolen.[1] Defendant pleaded guilty to vehicle theft.

## DISCUSSION

### I. *The Appellate Record of Jury Instructions Is Adequate for Review*

Defendant contends there is no reliable record of the jury instructions actually read or given to the jury because the oral instructions were not

---

[1] The jury was given a limiting instruction before this testimony. This evidence was admitted only to show defendant's intent.

recorded and the written instructions in the clerk's transcript are not exactly what the jury was given. He contends the standards for settling the record were not met, as defense counsel had no recollection of the matter at issue and the prosecutor who tried the case was not present for settling the record; therefore, he asserts, the record was not settled. He contends counsels' stipulation to not record the jury instructions does not waive the error because such a waiver must be done by defendant personally. It would be ineffective assistance of counsel to stipulate to not recording the instructions because there is no plausible tactical reason to do so. Further, an oral stipulation is ineffectual under the California Rules of Court. Defendant contends the jury instructions were a critical part of this case and the absence of a reliable record of the instructions for appellate review deprives him of due process.

### Background

After closing arguments, copies of the written jury instructions were distributed to the jurors. The court began to read the instructions. After a few instructions were read, the court stopped and called for a sidebar. After the unreported discussion, the court asked the parties to stipulate that the court reporter need not transcribe the instructions. The parties agreed and the remaining instructions were read off the record.

The clerk's transcript on appeal contains a set of written instructions labeled "Jury Instructions Given." These instructions begin with Judicial Council of California Criminal Jury Instructions (2006–2007) CALCRIM No. 200, on the duties of judge and jury, and continues through CALCRIM No. 3590, the final instruction on discharge of jury.

The record contains two versions of CALCRIM No. 521 on degrees of murder. The first version is titled: "521. People's Pinpoint—Murder: Degrees[.]" This instruction explains the defendant is being prosecuted for first degree murder under two theories: willful, deliberate, and premeditated murder, and felony murder in the commission of a robbery. For murder during the commission of a robbery, the instruction provides: "To prove that the defendant is guilty of first degree murder under this theory, the People must prove; [¶] 1. That the defendant committed robbery; [¶] 2. That the defendant intended to commit robbery; [¶] AND[.]" At this point the instruction ends.

The next page is another version of CALCRIM No. 521. The heading on this instruction reads: "This instruction was drafted by the People. The defense objected to the title of 'People's Pinpoint' going to the jury, so the following heading was given to the jury in their packet. [¶] 521. Court's Instruction - Murder: Degrees[.]" The remainder of this instruction is the

same as the previous page, except the word "AND" is missing. On page 197 of the clerk's transcript is the remainder of the instruction, beginning with: "3. That while committing robbery, the defendant did an act that caused the death of another person."

As noted above, this set of jury instructions includes the final instruction to be given upon discharge of the jury, CALCRIM No. 3590, as well as an instruction to the alternate jurors. Presumably, these instructions were not given to the jury when they began deliberations.

On August 2, 2007, appellate counsel wrote the superior court asking to augment the record to include the packet of instructions actually provided to the jury. The court clerk declared the instructions in the file were the official set and the only saved set.

Appellate counsel then moved to settle the record, pointing out the problems, noted above, with the set of instructions in the clerk's record.

The motion was granted. The trial court was ordered "to hold a hearing forthwith to provide a verbatim record of the oral instructions provided to the jury and a reliable exact duplicate of the written instructions viewed by the jurors."

The trial court held a hearing; present were the judge who presided at trial, the court clerk, Defense Counsel David Muller, and Robert Gold from the district attorney's office. The assistant district attorney who tried the case, Mark Curry, was not present; he had been appointed to a judgeship. Gold indicated he had communicated with Curry about the instructions.

The judge stated that based on her recollection, page 195 of the clerk's transcript titled "People's Pinpoint" was not given to the jury because the defense objected to the heading. The clerk agreed and Muller had no recollection, but agreed, "it does sound like something that I would do." Gold stated that was also Curry's recollection.

The judge then stated she was "quite clear" that the language at the top of page 196 of the clerk's transcript, noting the defense objection, was not given to the jury. Neither counsel had anything to add.

The record could not be clarified as to whether the instructions given to the jury included the "AND" in CALCRIM No. 521. The court clerk believed the "AND" was dropped when she added the language at the top of the page about the defense objection; the omission was a printing error. The judge had

no recollection, neither did Muller. Gold noted he had asked the court clerk for "her last prepared copy" of the instructions; in that set, the "AND" was included.

The record was settled that pages 168 through 214 of the clerk's transcript were given to the jury, except that page 195 was not given and the first two lines of page 196 were not given. Pages 215 through 218 were not given to the jurors. The record could not be settled as to whether the word "AND" was included in the instructions given or read to the jury.

*Analysis*

It is indisputable that jury instructions are an important part of a criminal trial. Errors in instructions, either alone or together with other trial errors, may mandate reversal of the judgment. (*People v. Silva* (1978) 20 Cal.3d 489, 493 [143 Cal.Rptr. 212, 573 P.2d 430].) A criminal defendant is entitled to a record on appeal that is adequate to permit meaningful review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People v. Howard* (1992) 1 Cal.4th 1132, 1166 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) Since an accurate record of the instructions given is necessary for appellate review, we hold the better practice is to record all oral instructions given to the jury.

"All instructions given shall be in writing, unless there is a phonographic reporter present and he takes them down, in which case they may be given orally . . . ." (Pen. Code, § 1127.) On appeal, the clerk's transcript must contain "any written jury instructions given by the court." (Cal. Rules of Court, rule 8.320(b)(4).) The reporter's transcript must contain "[a]ll instructions given orally." (*Id.*, rule 8.320(c)(4).)

In *People v. Gloria* (1975) 47 Cal.App.3d 1 [120 Cal.Rptr. 534], the court considered whether a court reporter was required to make a record of written instructions read to the jury. Because the trial judge could "misread an instruction, misspeak himself or extemporaneously elaborate upon the written instructions, . . . we hold it is the duty of a court reporter in a superior court criminal jury trial to make phonographic notes of what the judge says when he instructs the jury so an accurate transcript of the instructions as presented to the jury will be preserved for any appeal." (*Id.* at p. 6.) The court further held, however, that the normal reporter's transcript need not include the instructions as given. A transcript of those instructions would be required only if appellate counsel contends the written instructions deviate from the instructions orally given to the jury. (*Ibid.*)

■ Where, as here, the defendant stipulates to not reporting the oral instructions, the failure to record them has not been found to be error. In

*People v. Garrison* (1989) 47 Cal.3d 746 [254 Cal.Rptr. 257, 765 P.2d 419], the court addressed this issue. "We reject defendant's contention that the failure to report the reading of the instructions denied him due process. The parties stipulated that the court reporter might be excused from reporting the reading of the jury instructions. In light of counsel's stipulation and defendant's failure to suggest that there was any deviation in the reading from the typed copies contained in the record, we find no violation of due process." (*Id.* at pp. 780–781.)

Generally, a defendant's stipulation not to record a portion of the trial forfeits the claim the record is inadequate for appellate review. (*People v. Rogers* (2006) 39 Cal.4th 826, 857 [48 Cal.Rptr.3d 1, 141 P.3d 135]; *People v. Gaston* (1978) 20 Cal.3d 476, 485 [143 Cal.Rptr. 205, 573 P.2d 423] [stipulation that no reporter's transcript of portion of proceedings was needed waived complaint of inadequate record on appeal]; *People v. Ladd* (1982) 129 Cal.App.3d 257, 263 [181 Cal.Rptr. 29] ["By stipulating that the instructions need not be reported, defendant has waived any claim of error on appeal."].)

Defendant contends his stipulation was not effective because he did not personally stipulate to forego recording the oral instructions. He suggests counsel was ineffective in acceding to the trial court's request for a stipulation.

In determining whether defendant was prejudiced by the lack of an accurate record of jury instructions, the true issue is whether defendant was prejudiced by a jury instruction. Accordingly, we focus on the actual dispute over the jury instructions in this case, not on possible problems that may arise absent a reporter's transcript of the jury instructions. We note neither counsel below put on the record any objection to the instructions as read.[2] Nor is there any indication the court supplemented the instructions with extemporaneous comment. "Unless we assume that error was committed where none appears, we can find no possible prejudice to defendant in the stipulation and consequently no basis for a claim of inadequate assistance of counsel. [Citations.]" (*People v. Ladd, supra,* 129 Cal.App.3d 257, 263.)

Defendant complains it is impossible to know exactly what jury instructions were read to the jury, because the copy in the clerk's transcript is not

---

[2] Defendant argues the record was not settled as to what instructions were given to the jury because the trial judge did not refer to any notes, the defense attorney had no recollection, and the court clerk relied on assumptions as to what she did. Given the absence of any objection to the instructions as read, the most reasonable inference is that the instructions, including CALCRIM No. 521, were read without error. Defendant suggests it is possible neither version of CALCRIM No. 521 in the clerk's transcript was read or given to the jury. We find it incredible that the instruction on murder could have been omitted without an objection from either the prosecutor or defense counsel. The lack of recollection about the instructions indicates nothing remarkable occurred when the court read them.

accurate and the attempt to settle the record was unsuccessful. As the hearing to settle the record shows, the actual dispute as to what was in the jury instructions boils down to whether an "AND" was omitted from CALCRIM No. 521. Notably, defendant does not argue this omission was prejudicial error. Instead, he merely speaks of "arguable error."

Assuming the "AND" was omitted, we find no prejudicial error. The portion of CALCRIM No. 521 addressing felony murder where the murder is committed in the commission of a robbery provides: "To prove that the defendant is guilty of first degree murder under this theory, the People must prove; [¶] 1. That the defendant committed robbery; [¶] 2. That the defendant intended to commit robbery; [¶] AND [¶] 3. That while committing robbery, the defendant did an act that caused the death of another person." Defendant suggests that if the "AND" was omitted, the jury may have believed the People had to prove only one element, rather than all three. That is not plausible. Even without the "AND" the instruction reads as requiring all three elements.[3] Otherwise, the jury could find first degree murder if it found only that defendant robbed or intended to commit robbery, even if no one was killed. " 'Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.' [Citation.]" (*People v. Williams* (1995) 40 Cal.App.4th 446, 457 [46 Cal.Rptr.2d 730].)

While we would prefer a reporter's transcript of the instructions read to the jury, we find no prejudicial error in its absence. The record, as settled, indicates any error in the instructions was harmless. The absence of a record of the oral instructions given did not deprive defendant of due process or the right to a fair trial.

## II. *There Was Sufficient Evidence of Robbery*

Defendant contends there was insufficient evidence of robbery because the car was not taken from the presence of one who had actual or constructive possession of it. Defendant contends the robbery conviction and the robbery special circumstance must fall. In addition the murder conviction must be reversed because it was likely based on felony murder in the commission of a robbery.

---

[3] Any possible confusion as to this was cleared up by the prosecutor's argument: "Bottom line is it's the same basic elements as felony murder. So if you conclude, yeah, he was engaged in a robbery when he did this act, these are the three elements, basically the same, that he did an intentional robbery, that he did an act that caused death, and the reason she died is because of the robbery. There's a connection between the robbery and the death."

■ "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.) The Legislature has limited the victims of robbery to those in either actual or constructive possession of the property taken. (*People v. Nguyen* (2000) 24 Cal.4th 756, 764 [102 Cal.Rptr.2d 548, 14 P.3d 221].) A person who does not have immediate physical control may nonetheless have constructive possession of property if he has sufficient representative capacity with respect to the owner of the property, "so as to have express or implied authority" over the property. (*People v. Frazer* (2003) 106 Cal.App.4th 1105, 1113 [131 Cal.Rptr.2d 319].) Constructive possession does not require an absolute right of possession. "For the purposes of robbery, it is enough that the person presently has some loose custody over the property, is currently exercising dominion over it, or at least may be said to represent or stand in the shoes of the true owner." (*People v. Hamilton* (1995) 40 Cal.App.4th 1137, 1143 [47 Cal.Rptr.2d 343].) Constructive possession will be found where the person has a special relationship with the owner of the property. (*Sykes v. Superior Court* (1994) 30 Cal.App.4th 479, 484 [35 Cal.Rptr.2d 571].)

Courts often recognize the necessary special relationship in robbery cases where business property is taken from the presence of an agent or employee of the business. (See, e.g., *People v. Miller* (1977) 18 Cal.3d 873, 880 [135 Cal.Rptr. 654, 558 P.2d 552] [store security guard], overruled on other grounds as recognized in *People v. Oates* (2004) 32 Cal.4th 1048, 1067, fn. 8 [12 Cal.Rptr.3d 325, 88 P.3d 56]; *People v. Gilbeaux* (2003) 111 Cal.App.4th 515, 523 [3 Cal.Rptr.3d 835] [janitors employed by business's cleaning company]; *People v. Jones* (1996) 42 Cal.App.4th 1047, 1054 [50 Cal.Rptr.2d 46] [store truckdriver]; *People v. Estes* (1983) 147 Cal.App.3d 23, 27 [194 Cal.Rptr. 909] [same]; *People v. Poindexter* (1967) 255 Cal.App.2d 566, 568–569 [63 Cal.Rptr. 332] [barmaid]; *People v. Downs* (1952) 114 Cal.App.2d 758, 765 [251 P.2d 369] [janitors].) Even a visitor in a store who was forced to remove and surrender money from the store's cashbox has been held to be a victim of the robbery. (*People v. Moore* (1970) 4 Cal.App.3d 668, 670–671 [84 Cal.Rptr. 771].)

By contrast, where property is taken from one with no relationship to the owner of the property, such as a Good Samaritan, there is no robbery. In *People v. Nguyen, supra*, 24 Cal.4th at page 764, the court found a visitor to the business from which property was taken was not a victim of the robbery. In *People v. Galoia* (1994) 31 Cal.App.4th 595 [37 Cal.Rptr.2d 117], a man collecting money from his video games in a convenience store tried to stop a robbery. The court found he was not a robbery victim. (*Id.* at pp. 597–599.) In *Sykes v. Superior Court, supra*, 30 Cal.App.4th 479, the defendant stole a saxophone from one business and was chased and apprehended by a security

guard working for another business. There was no special relationship between the business and the security guard from a neighboring business. (*Id.* at p. 484.)

Courts have also recognized the necessary special relationship for robbery in nonbusiness contexts. For example, in *People v. Bekele* (1995) 33 Cal.App.4th 1457 [39 Cal.Rptr.2d 797] (disapproved on other grounds in *People v. Rodriguez* (1999) 20 Cal.4th 1, 13–14 [82 Cal.Rptr.2d 413, 971 P.2d 618]), a man saw the defendant burglarizing his pickup truck and asked his coworker to help him stop the theft. The coworker struck and chased the defendant, demanding he drop the property, until the defendant threatened him with a gun. The court found that the circumstances were sufficient to support the defendant's conviction of robbery from the coworker because the owner's request for help impliedly authorized the coworker to act in a representative capacity, analogous to a security guard, in striking and chasing down the defendant. Thus, the coworker had constructive possession of the stolen property. (*Bekele*, at p. 1462.)

A special relationship in a family context was found in *People v. Gordon* (1982) 136 Cal.App.3d 519 [186 Cal.Rptr. 373] (*Gordon*). In the instant case, the trial court relied on *Gordon* in denying defendant's motion to dismiss. In *Gordon*, two armed robbers entered the home of Joseph and Mary Lopes, bound them and took $1,000, marijuana and a shoulder bag belonging to their adult son, who lived with them but was not at home at the time of the robbery. The court found the evidence that the Lopeses owned and lived in the residence sufficient to support the jury's findings that they possessed their son's property within the meaning of the robbery statute. It reasoned that the jury could properly conclude from such facts that the Lopeses were responsible for protecting personal property belonging to their son who lived in their home. (*Id.* at pp. 528–529.)

Defendant contends the key to the holding in *Gordon* was that the goods were inside the parents' house. He argues *Gordon* is distinguishable because here the car was parked outside. A car, of course, is customarily outside the house; here it was parked in a space designated for the condominium. We disagree that the key to *Gordon* was the location of the property; rather, it was the relationship of the victims of the robbery to the owner of the property. The *Gordon* court found that if employees and janitors had constructive possession of their employer's property, "parents have at least the same responsibility to protect goods belonging to their son who resides with them in their home." (*Gordon, supra*, 136 Cal.App.3d at p. 529.)

We find sufficient evidence to support finding Brophy a victim of robbery. As in *Gordon*, the owner of the property was her son who lived in

her home. While the parents in *Gordon* denied knowledge of the marijuana that was stolen (*Gordon, supra*, 136 Cal.App.3d at p. 529), Brophy not only knew about the car, but had a connection to it. She had helped her son buy it, had access to the keys, had driven it, and was named on the insurance. The car was kept in one of the parking spaces designated for the condominium, close enough that she was able to respond when defendant tried to steal it. From these facts, the jury could conclude that Brophy had sufficient "loose custody" over the car to be a victim of robbery.[4] (*People v. Hamilton, supra*, 40 Cal.App.4th at p. 1143.)

### III. There Was No Prejudicial Error in Denying Defendant's Objection to the Robbery Instruction

Defendant contends the trial court erred in overruling his objection that the robbery instruction was inadequate.[5] He contends the instruction was inadequate in explaining the right to control necessary for robbery.

The objections to the instructions were put on the record. Defense counsel stated: "Then the other last substantive objection that I have is CALCRIM instruction of 1600. I believe that's in regards to robbery. I don't believe that the robbery instruction is sufficient in this regard because we live in a common law state where the force used has to be done against the owner of the property or someone that has control or authority over the property, not just any person. And I believe that the instruction is inadequate, so I'd be objecting."

The trial court overruled the objection and instructed the jury in the language of CALCRIM No. 1600 as follows:

"The defendant is charged in Count Two with robbery.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant took property that was not his own;

---

[4] These facts are clearly distinguishable from those in *People v. Nguyen, supra*, 24 Cal.4th 756, where the proposed robbery victim had no relationship to the owner of the property. There a number of employees gathered in the lunchroom to celebrate a birthday and the husband of one employee joined them. Robbers with guns entered and took property from the business. The husband, from whom no property was taken, was found not to be a robbery victim. (*Id.* at p. 764.)

[5] The failure to ask the trial court to clarify or amplify an instruction bars raising the issue on appeal. (*People v. Cole* (2004) 33 Cal.4th 1158, 1211 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

"2. The property was taken from another person's possession and immediate presence;

"3. The property was taken against that person's will;

"4. The defendant used force or fear to take the property or to prevent the person from resisting;

"AND

"5. When the defendant used force or fear to take the property, he intended to deprive the owner of it permanently or to remove it from the owner's possession for [some] extended period of time that the owner would be deprived of a major portion of the value or enjoyment of the property. .

"The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using force or fear, then he did not commit robbery.

"A person *takes* something when he or she gains possession of it and moves it some distance. The distance moved may be short.

"Two or more people may possess something at the same time.

"A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the right to control it, either personally or through another person.

"*Fear*, as used here, means fear of injury to the person himself or herself.

"Property is within a person's immediate presence if it is sufficiently within his or her physical control [so] that he or she could keep possession of it if not prevented by force or fear.

"An act is done against a person's will if that person does not consent to the act. In order to consent, a person must act freely and voluntarily and know the nature of the act."

Defendant contends the instruction's shift from "another person" to "any person," weakens its discussion of ownership. He objects that ownership is mentioned only with respect to the robber's specific intent to deprive the owner. To the extent defendant is contending there is no robbery unless the victim owns the property, he is mistaken. "It is no defense to a charge of robbery (or of theft) that the victim was not the true owner of the property

taken." (*People v. Moore, supra*, 4 Cal.App.3d at p. 670.) A special relationship with the owner of the property, as here, is sufficient. (*Sykes v. Superior Court, supra*, 30 Cal.App.4th at p. 484.)

Defendant contends the instruction failed to state that the People must prove the victim of the robbery had the right to control the property. He is mistaken. The instruction states the People must prove, "The property was taken from another person's possession and immediate presence." Possession is then defined as, "control over [the property] or the right to control it, either personally or through another person."

Defendant contends the instruction is inadequate in explaining the necessary "right to control." He complains the prosecutor argued the "right to control" in the broadest possible terms, focusing on the fact that Brophy was Kendrick's mother. To the extent he contends the prosecutor's argument was misconduct, he has forfeited the contention by failing to object below. The "failure to object and request an admonition waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective." (*People v. Arias* (1996) 13 Cal.4th 92, 159 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

Defendant contends the familial relationship of mother and son is insufficient to establish the right of control necessary for robbery. He relies on cases indicating a family relationship does not establish control for purposes of agency in civil law. Missing from his argument, however, is any authority that civil agency law sets the standard for robbery.

As we have found above, the special relationship between Brophy and Kendrick, that they were mother and son and lived together, coupled with the facts that the car was kept in a designated parking space and Brophy helped pay for the car and was named on the insurance, was sufficient evidence to make her a victim of robbery. Indeed, there was more evidence here of a special relationship than in *Gordon*. While the instruction could have provided more assistance to the jury in finding she had control by specifying the factors the jury could consider, its failure to do so did not prejudice defendant where the record does not show the jury had any difficulty in finding the car was taken from Brophy's "possession and immediate presence" and the evidence supporting that determination was uncontradicted. On these facts, constructive possession is established as a matter of law.

#### IV. *There Was Good Cause to Reopen Jury Selection Before the Jury Was Sworn*

Defendant contends the trial court erred in permitting the prosecutor to exercise a peremptory challenge to a juror after both sides had accepted the

jury panel. He argues once both sides have passed consecutively on the exercise of peremptory challenges, the jury should be sworn and no further peremptory challenges allowed.

*Background*

At one point in jury selection, during the exercise of peremptory challenges, both sides passed consecutively. The court indicated they would return after lunch to select the alternates. The panel was not sworn.

After lunch, before resuming jury selection, the parties met in chambers with Juror N. Juror N. expressed concern about serving as a juror because he owned his own business and worked nights. He worked Monday through Thursday. He was concerned because he would have to be up 24 hours straight during the trial.

The defense attorney thought it was too much to ask of a juror and was concerned he would not be alert. The prosecutor thought Juror N. would be okay, noting he did not raise the issue until the last minute. The court was uncomfortable asking Juror N. to serve, particularly if something happened while he was driving. The court declared, "we keep going."

The prosecutor raised the issue of excusing two other jurors by stipulation. The parties had agreed to excuse Jurors B. and M.; they had been told and had left the courtroom.

In open court, Juror N. was dismissed and jury selection continued. When the court asked if the panel was passed for cause, an unreported sidebar conference was held. The court indicated that except for the objection noted at sidebar, they would move to the challenge phase of jury selection. The court asked counsel to remind the court to put the discussion on the record. The prosecutor then excused Juror J., a juror who was part of the original panel. The defense requested another sidebar, which was held off record. Juror J. was then excused. The defense exercised a challenge and then both sides passed. The court noted, "So we are back to choosing alternates." The jury panel was sworn and then the alternates were sworn.

The next day, during trial, defense counsel put on the record his objection to the People removing Juror J. after Juror N. expressed his concern about serving. Counsel believed the jury had been impaneled and removing Juror N. did not give the People the right to start excusing other jurors.

The prosecutor stated for the record that the jury had not yet been sworn. "We were still in the jury selection process, and I feel that I properly used

one of my peremptory challenges." The court agreed that after Juror N. raised his concerns about serving, "the jury selection process was again thrown open for both counsel to exercise challenges to anyone in the box."

*Analysis*

■ In this life-sentence case defendant was entitled to 20 peremptory challenges. (Code Civ. Proc., §§ 225, subd. (b)(2), 231.) A challenge to an individual juror must be made before the jury is sworn. (Code Civ. Proc., § 226, subd. (a).) The phrase " 'the jury is sworn' " refers to the trial jury, not the alternates. (*People v. Cottle* (2006) 39 Cal.4th 246, 255 [46 Cal.Rptr.3d 86, 138 P.3d 230].) If a party were allowed to use peremptory challenges to members of the jury after the jury was sworn, but before the alternates were selected, gamesmanship would be encouraged. (*Id.* at p. 257.) "For example, if a favorable juror was selected as an alternate, a party would then try to challenge a member of the jury so that the alternate could replace the juror. Nothing in the legislative history suggests an intention to create such a scheme." (*Ibid.*)

Peremptory challenges are taken or passed by each side alternatively, beginning with the People. (Code Civ. Proc., § 231, subd. (d).) "When each side passes consecutively, the jury shall then be sworn, unless the court, for good cause, shall otherwise order." (*Ibid.*; see also *id.*, subd. (e).)

After the jury is impaneled and sworn, the court may call for additional jurors to serve as alternate jurors. (Code Civ. Proc., § 234; Pen. Code, § 1089.) An alternate juror may become a regular juror if, before the jury returns its verdict, a juror becomes sick or is otherwise unable to perform his duty. (Code Civ. Proc., § 233; Pen. Code, § 1089.)

In this case, the jury was not sworn immediately after both sides passed consecutively. That situation was presented in *People v. Niles* (1991) 233 Cal.App.3d 315 [284 Cal.Rptr. 423] (*Niles*). In *Niles*, the defendant's jury was not sworn until after his codefendant's jury was selected. During a hearing to finalize jury selection, the trial court informed counsel that the husband of one juror, a sheriff's sergeant, had reported that the defendant was talking to him and being "very nice," which concerned the sergeant. After questioning the juror, both counsel agreed she should stay. The next day, however, the defendant requested that the juror be excused and that he be allowed to use one of his peremptory challenges for that purpose. The trial court denied the request. (*Id.* at pp. 318–319.)

On appeal the court rejected the defendant's contention that he had an absolute right to use his peremptory challenges until the jury was sworn.

(*Niles, supra*, 233 Cal.App.3d at p. 320.) Instead, once both sides pass consecutively on peremptory challenges, even though the jury is not actually sworn, the right to exercise any remaining challenges is subject to the discretion of the trial court, based upon a showing of good cause to reopen jury selection. (*Ibid.* & fn. 4.) Although the jury was not sworn, the defendant did not have an unqualified right to exercise a peremptory challenge. Rather, after both sides consecutively pass on their peremptory challenges, "the exercise of the remaining peremptory challenge was no longer a matter of right but rather a matter within the discretion of the trial court, contingent upon defendant's showing of good cause. The trial court's exercise of that discretion will not be set aside absent a clear showing of abuse. [Citation.]" (*Id.* at pp. 320–321.)

Here, after both sides consecutively passed on the exercise of peremptory challenges, the trial court reopened jury selection and thereafter permitted the prosecutor to use a peremptory challenge. Under *Niles*, the issue is whether the trial court abused its discretion in finding good cause to reopen jury selection. We find it did not.

Both parties agree that "good cause," liberally construed, requires taking account of " ' "real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith. . . ." ' [Citation.]" (*Gibson v. Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 499, fn. 8 [108 Cal.Rptr. 1, 509 P.2d 945].) Here, the trial court properly found good cause. There was a real, substantive and objective need to reopen jury selection. Juror N. had concluded it would be difficult for him to serve on the jury because it would require him to stay up all day and night for several days in a row. With the consent of defense counsel, the court dismissed him. Therefore, there was a need to continue with jury selection. We recognize that the court could have filled Juror N.'s slot with an alternate juror pursuant to section 233 of the Code of Civil Procedure. When a court has a choice of possible actions available, it does not abuse its discretion in deciding to choose one rather than the other. We find no abuse of discretion in reopening jury selection, which then permitted both sides to exercise peremptory challenges to the panel.

## V. *The Court Properly Imposed a $10,000 Restitution Fine*

Defendant contends the trial court abused its discretion in imposing a $10,000 restitution fine pursuant to Penal Code section 1202.4 because he will not have the ability to pay it. In his sentencing brief, defendant requested the minimum fine of $200, pointing out that at current prison wages, the

earliest he could pay the fine would be 27 years, while at the minimum rate it would take 126 years. Further, he was unlikely to get a prison job for the first few years.

■ "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record." (Pen. Code, § 1202.4, subd. (b).) Where a defendant is convicted of a felony, the fine shall be set at between $200 and $10,000, commensurate with the seriousness of the offense. (Pen. Code, § 1202.4, subd. (b)(1).) Here, defendant was convicted of a special circumstance murder, so the seriousness of the crime supported the maximum fine.

Defendant's inability to pay the fine is not a compelling and extraordinary reason not to impose the fine, but it shall be considered in setting the fine above the minimum of $200. (Pen. Code, § 1202.4, subds. (c), (d).) Section 1202.4 presumes a defendant has the ability to pay the fine. (*People v. Romero* (1996) 43 Cal.App.4th 440, 448–449 [51 Cal.Rptr.2d 26].) "A defendant shall bear the burden of demonstrating his or her inability to pay." (Pen. Code, § 1202.4, subd. (d).)

Here, defendant put forth figures to show, at current prison wages, it would be very difficult for him to pay the fine; it would take a very long time and the fine might never be paid. Defendant did not, however, show an absolute inability to ever pay the fine. Moreover, in setting the amount, the trial court properly considered not only defendant's inability to pay, but also "the seriousness and gravity of the offense and the circumstances of its commission." (Pen. Code, § 1202.4, subd. (d).) Defendant's crime was the most serious and grave. The trial court did not abuse its discretion in imposing the maximum fine. (See *People v. Draut* (1998) 73 Cal.App.4th 577, 581 [86 Cal.Rptr.2d 469] [trial court abused discretion in reducing restitution based on defendant's inability to pay].)

## VI.   *The Parole Revocation Fine Must Be Stricken*

■ The trial court also imposed a $10,000 parole revocation fine, pursuant to Penal Code section 1202.45. Defendant contends this fine must be stricken because defendant was sentenced to life without the possibility of parole. The Attorney General concedes the error; a parole revocation fine is inapplicable where there is no possibility of parole. (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819 [44 Cal.Rptr.3d 788]; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 [83 Cal.Rptr.2d 157].) We accept the concession.

## DISPOSITION

The trial court is ordered to strike the $10,000 parole revocation restitution fine imposed under section 1202.45. In all other respects, the judgment is affirmed.

Hull, J., and Butz, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 14, 2009, S168234. George, C. J., did not participate therein.