Filed 4/10/15  P. v. Ramirez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059933 |
| v. | (Super.Ct.No. FSB1204420) |
| ANTHONY RAY RAMIREZ, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Jr., Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Eric A. Swenson, Lynne McGinnis, and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Anthony Ray Ramirez and a second man confronted a group of four strangers. Defendant said, "If you mess with my girl, I'll kill you," then advanced toward the men. Two of the men — expecting a fair fistfight — responded by moving toward defendant. Defendant, however, whipped out a gun and shot both of them. One survived; the other died.

A jury found defendant guilty on three counts:

1. Second degree murder (Pen. Code, § 187, subd. (a)), with an enhancement for personally and intentionally discharging a firearm, causing great bodily injury or death (Pen. Code, § 12022.53, subd. (d)).

2. Attempted murder (Pen. Code, §§ 187, subd. (a)), 664, subd. (a)), with an enhancement for personally and intentionally discharging a firearm, causing great bodily injury or death (Pen. Code, § 12022.53, subd. (d)).

3. Assault with a firearm (Pen. Code, § 245, subd. (a)(2)), with an enhancement for personal firearm use (Pen. Code, § 12022.5).

The jury deadlocked with respect to whether the attempted murder was willful, deliberate, and premeditated, and the trial court dismissed this allegation. Defendant was sentenced to a total of 78 years 4 months to life in prison.

Defendant now contends:

1. The trial court erred by instructing on the significance of defendant's failure to explain or deny evidence against him.

2. Defendant's trial counsel rendered ineffective assistance by failing to argue that defendant lacked the ability to pay a $10,000 restitution fine.

We find no error.  Hence, we will affirm.

I

FACTUAL BACKGROUND

A.      *The Prosecution's Case*.

Defendant and his girlfriend were staying in a house at the corner of Johnson Street and 40th Street in San Bernardino while visiting from Arizona.  Witness Heather Delio also lived in the same house.

Hector Hernandez and Raymond Torres lived in a house less than a block north, at 4036 Johnson Street.  They did not know defendant.

1.      *The encounter at the liquor store*.

On September 30, 2012, around 5:45 p.m., Hector[1] was walking north on Johnson Street.  With him were his cousins, Jesus Rosales and Daniel Rosales.  Each of them had had from one to three beers earlier in the day; Daniel may have had as many as five.  They were going to a liquor store to buy more beer.

---

[1]      We will refer to all four men in the victim group by their first names.  Two of them had the same last name, so we use their first names for the sake of clarity.  We also use first names for the other two, to be consistent internally, as well as to be consistent with the reporter's transcript.

At the same time, Delio and defendant's girlfriend were also walking up Johnson Street to the same liquor store. The women ran into defendant, who was riding a bicycle. Defendant "threaten[ed]" his girlfriend. Hector's group saw defendant speak to the women, then turn around and go back down Johnson Street.[2]

At the liquor store, Hector's group bought an 18-pack of Budweiser. They then walked back to Hector's house. Raymond was already there.

### 2. *The first encounter at the house*.

Not more than five minutes later, all four men in Hector's group were out in the front yard when they saw defendant ride by on his bicycle. He rode up and down the street, passing the house three or four times. He started "mad[-]dogging" them.

Defendant and Daniel "exchanged words." At that point, defendant had stopped in the middle of the street. The others calmed Daniel down. Jesus told defendant to "chill out" and explained that Daniel had been drinking. Defendant rode away.

### 3. *The second encounter at the house*.

About five minutes later, defendant came back, again on a bicycle. This time, however, he was accompanied by one Rusty Miner,[3] also on a bicycle.

---

[2] Jesus told police that defendant "seemed to want to get interested with the girls," and that Daniel "laughed out loud."

[3] Originally, Miner was charged, as a codefendant in this case, with acting as an accessory after the fact. (Pen. Code, § 32.) We take judicial notice that he pleaded guilty before trial.

4

Daniel yelled, "That's what I thought, you little bitch." Defendant said, "Who are you calling a bitch?"

Defendant accused Daniel of whistling, and added, "If you mess with my girl, I'll kill you."

Defendant got off the bike and came toward the men. Hector thought there was going to be a fistfight. Because there were two people on defendant's side, he felt he should back up Daniel. Accordingly, he took off his shirt and exclaimed, "Fuck this shit." Daniel started to walk toward defendant and Hector started to walk toward Miner. No one in Hector's group had a weapon.

When Daniel was four to eight feet away from defendant, defendant pulled out a gun and fired two shots.

The first shot hit Daniel; it entered his left shoulder and exited from his upper right back, killing him within seconds. At the time of death, his blood alcohol level was approximately 0.25 percent.

Hector turned around and started running, but the second shot hit him; it entered the back of his neck and exited under his right ear. He was treated at a hospital and survived.

Raymond ran away, down the side of the house. When he looked back, he saw that defendant had followed him and was pointing the gun at him. He put his hands up and said, "I have a son." Defendant took the 18-pack of Budweiser, got back on his bicycle, and left.

On the way back from the liquor store, Delio and defendant's girlfriend heard shots. After they got back home, defendant's girlfriend helped defendant and Miner come in through Delio's bedroom window. Defendant told all of them, "[K]eep your mouth shut."

Later that night, the police found defendant and Miner in Delio's bedroom and arrested them. Defendant pretended to be asleep. He gave the police a false name, "Michael Ramirez."

A .40-caliber semiautomatic handgun was under the bed. Testing showed that this was the gun used in the shooting.

An empty 18-pack of Budweiser was in the room; Budweiser cans were in the bedroom and elsewhere around the house.

B.  *The Defense Case*.

Defendant took the stand on his own behalf.

He testified that he and Miner went out on their bikes to look for his girlfriend. They caught up with her and Delio on the way to the liquor store. Defendant's girlfriend was upset because he had been talking to an ex-girlfriend (who was also the mother of his children); he tried to reassure her. However, she told him to leave her alone. He and Miner then continued to ride around and around the block on their bikes.

As they rode by the house, Daniel came out into the street. He was acting as if he wanted to fight defendant. He said, "Who are you mad[-]dogging?" He called defendant a "[f]ucking bitch." He ordered defendant to get off his bike. Defendant said, "I don't want no problems with you guys" and rode away.

Defendant went to the liquor store, looking for his girlfriend again, but could not find her. On the way back home, he and Miner passed the house.[4]

This time, Daniel came out into the middle of the street. Defendant tried to go around him, but Daniel blocked his path, so he stopped. Daniel said, "I thought I told you to stop riding up and down my block." Defendant said to the other men, "Somebody get this [bitch]." Daniel said, "Who are you calling a [bitch]?"

Hector pulled off his shirt and threw it; first he said, "Fuck this fool," then he said, "Blast this fool." All four men "jumped up" and came out into the street.

According to defendant, Daniel pulled out a gun. Defendant — in fear for his life — pulled out his own gun and shot twice. He was pointing the gun toward Daniel, but Hector was right behind Daniel.

Defendant denied chasing Raymond. He testified that it was Miner who took the beer.

---

**4** Defendant's testimony was hopelessly inconsistent with respect to whether, at this point, he was going north or south on Johnson.

## II

## INSTRUCTION ON FAILURE TO EXPLAIN OR DENY EVIDENCE

Defendant contends the trial court erred by instructing on the relevance of his failure to explain or deny evidence against him.

The trial court instructed the jury with CALCRIM No. 361, as follows:

"If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the [d]efendant guilty beyond a reasonable doubt.

"If the [d]efendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Preliminarily, the People argue that defendant forfeited his present contention by failing to object to CALCRIM No. 361 below. "By statute, a defendant may challenge on appeal an instruction that affects his or her substantial rights even when no objection has been made in the trial court. [Citations.]" (*In re Sheena K.* (2007) 40 Cal.4th 875, 881, fn. 2; see also Pen. Code, §§ 1176, 1259, 1469.) "'[W]hether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . .' [Citation.]" (*People v. Ngo* (2014) 225 Cal.App.4th 126, 149.) We therefore turn to the merits.

As defendant concedes, in *People v. Saddler* (1979) 24 Cal.3d 671, our Supreme Court upheld the constitutionality of an essentially identical instruction. (*Id*. at pp. 678-681.) Specifically, it rejected arguments that the instruction (1) violated the right against self-incrimination (*id*. at pp. 678-679), (2) violated the presumption of innocence (*id*. at pp. 679-680), and (3) impermissibly singled out the testimony of a defendant from that of other witnesses (*id*. at pp. 680-681).

Likewise, in *Caminetti v. United States* (1917) 242 U.S. 470, the United States Supreme Court held that a similar instruction did not violate the right against self-incrimination (*id*. at pp. 494-495): "[W]here the accused takes the stand in his own behalf and voluntarily testifies for himself [citation], he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it." (*Id*. at p. 494.)

Here, instead of arguing that the instruction violates the right against self-incrimination, defendant argues that it violates the right to testify. Nevertheless, the Supreme Court's reasoning in *Caminetti* is on point — the right to testify is not a right to "stop short in [one's] testimony."

Defendant argues that there is no need for a separate instruction relating solely to a defendant's testimony. CALCRIM No. 226, which applies to the testimony of every witness, allows the jury to consider "anything that reasonably tends to prove or disprove

9

the truth or accuracy of that testimony . . . ." Specifically, it allows the jury to ask itself, "How reasonable is the testimony when you consider all the other evidence in the case?" and "Did other evidence prove or disprove any fact about which the witness testified?" CALCRIM No. 361, however, is based on Evidence Code section 413, which provides, "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him . . . ." This rule of law applies only to a party. (*People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1068 ["Evidence Code section 413 allows a trier of fact to consider a *party's* failure to explain or deny evidence, a principle expressed in CALCRIM No. 361. This distinguishes a criminal defendant from the other trial witnesses, whether prosecution or defense."].)

We also note that a defendant differs from a nonparty witness in two relevant respects. First, the defendant has a uniquely personal stake in the outcome of the trial; all else being equal, this gives him or her a stronger motivation to explain or deny any seemingly incriminating facts. Second, the defendant has significant control over the conduct of the defense. He or she can interact with defense counsel throughout the trial; if the defendant has something helpful to say, defense counsel can make sure the necessary question gets asked.

Finally, defendant argues that the instruction did not apply because he did not fail to explain or deny any evidence that he could reasonably be expected to have knowledge of.

"Before an instruction on this principle may be given, the trial court *must* ascertain as a matter of law: (1) if a question was asked that called for an explanation or denial of incriminating evidence; (2) if the defendant knew the facts necessary to answer the question or if some circumstance precluded the defendant from knowing such facts; and (3) if the defendant failed to deny or explain the incriminating evidence when answering the question. [Citations.] [¶] Contradiction of the state's evidence is not by itself a failure to deny or explain. [Citations.] Failure to recall is not an appropriate basis for this instruction. [Citation.]" (Judicial Council of Cal., Crim. Jury Instns. (2014) Bench Notes to CALCRIM No. 361, bolding replaced with italics.)

Actually, there were multiple matters that defendant failed to explain or deny.

Defendant testified that, when he fired, he was out in the street. Both Daniel and Hector were also in the street, a few feet southwest of him. Accordingly, he fired both shots in the same direction — to the southwest.

One bullet, however, was found under a car due west of defendant's claimed position. The other bullet was found in front of a house northwest of defendant's claimed position.

Two bullet casings were also found at the scene. Neither side has asked to have transmitted to us the exhibits that would clarify exactly where these casings were found. However, it appears that they were found at a location inconsistent with defendant's claimed position. Also, while blood trails were found, no blood was found in the street.

11

On cross-examination, defendant testified:

"Q  Do you know why there's no blood other than what's shown, the streak there by Placard Number Two?  [¶] . . . [¶] . . .

"THE WITNESS:  No, I don't, sir."

"Q  Can you explain to the jury, if you know, how the casings from the Hi-Point gun ended up in the locations indicated by Placard Seven and Placard Eight . . . ?

"A  I don't — I don't know."

"Q  Do you have any information about how that bullet ended up under that car? [¶] . . . [¶] . . .

"THE WITNESS:  I don't know, sir."

"Q  . . . [¶] . . . [¶] If you know, can you explain to the jury how if you shot in the direction indicated by the arrow twice very quickly that bullet ended up north?  [¶] . . . [¶] . . .

"THE WITNESS:  I was pointing the gun at Daniel, sir.  So I don't know if by me running (indicating) away from him.  I just remembered shooting towards Daniel, sir.

"BY [THE PROSECUTOR]:

"Q  In the direction —

"A  That's all I remember.  I don't remember where the bullets landed or anything like that."

Thus, this is not a case in which the defendant simply gave a different account than the prosecution's witnesses did.  Rather, defendant's account was inconsistent with the

12

physical evidence, and he was unable to explain that physical evidence. Moreover, this is not a case in which the defendant could not be expected to have the information necessary to explain or deny the evidence against him. Defendant admitted being present and firing the shots. Surely he knew where he was standing, where the victims were standing, and what direction he fired in; thus, the jury could reasonably expect him to be able to explain the location of the bullets, bullet casings, and blood drops.

We therefore conclude that the trial court did not err by giving CALCRIM No. 361.

## III

## FAILURE TO OBJECT TO THE AMOUNT OF THE RESTITUTION FINE

Defendant contends that his trial counsel rendered ineffective assistance by failing to argue that defendant lacked the ability to pay a $10,000 restitution fine.

A.    *Additional Factual and Procedural Background.*

According to the probation report, defendant had no income and no assets. The probation officer recommended a finding that defendant was not able to reimburse appointed counsel fees or presentence investigation costs. However, she also recommended a restitution fine in the amount of $10,000. The trial court followed all of these recommendations. Defense counsel did not object to the amount of the restitution fine.

13

B.    *Analysis.*

The trial court was required to impose a restitution fine, absent "compelling and extraordinary reasons for not doing so . . . ." (Pen. Code, § 1202.4, subd. (b).) For a defendant sentenced in 2013 for a felony, as defendant was, the minimum amount of the fine was $280; the maximum amount was $10,000. (*Ibid.*)

"The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense." (Pen. Code, § 1202.4, subd. (b)(1).) "In setting the amount of the fine . . . , the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime." (Pen. Code, § 1202.4, subd. (d).)

Nevertheless, "the court may determine the amount of the fine as the product of the minimum fine . . . multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (Pen. Code, § 1202.4, subd. (b)(2).)

"Express findings by the court as to the factors bearing on the amount of the fine shall not be required." (Pen. Code, § 1202.4, subd. (d).)

"When challenging a conviction on grounds of ineffective assistance, . . . the defendant must first show counsel's performance was deficient, in that it fell below an

14

objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

We may assume, without deciding, that it was objectively unreasonable not to at least ask the trial court to reduce the amount of the restitution fine. Even if so, defendant cannot show a reasonable probability that doing so would have changed the outcome. Defendant stood convicted of two of the most serious and grave offenses possible, committed against two different victims. The statutorily permissible formula — $280 times 78 years times two counts — would produce an amount far in excess of the $10,000 maximum. The probation officer had independently concluded that the maximum amount was appropriate. The trial court was aware of defendant's lack of income and assets, as shown by its finding that he lacked the ability to reimburse counsel fees or presentence investigation costs. However, "[i]n the absence of a contrary showing, the court is entitled to presume the defendant will pay the restitution fine out of future earnings. [Citation.]" (*People v. Urbano* (2005) 128 Cal.App.4th 396, 405.) Presumed future earnings may include future prison wages, even when "it would take a very long time and the fine might never be paid." (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.) Thus, there is no reason to suppose that, even if defense counsel had objected, the trial court would have lowered the amount of the restitution fine.

## IV

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

KING
J.

16