Filed 8/20/14  P. v. Alvarado CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B247292 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA379667) |
| v. | |
| EDYN ALVARADO et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Craig J. Mitchell, Judge.  Modified in part, remanded in part and affirmed with directions in part.

Rachel Lederman, under appointment by the Court of Appeal, for Defendant and Appellant Edyn Alvarado.

Katharine Eileen Greenebaum, under appointment by the Court of Appeal, for Defendant and Appellant Mario Morales.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendants Edyn Balmor Alvarado and Mario Rene Morales of four counts of second degree robbery (Pen. Code, § 211)[1] (counts 1-4), one count of misdemeanor vandalism (§ 594, subd. (a)) (count 5), and one count of vandalism of religious property, a felony (§ 594.3, subd. (a)) (count 6).  With respect to counts 1 through 4 and 6, the jury found that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang pursuant to section 186.22, subdivision (b)(1)(C).  With respect to counts 1 through 4, the jury found that a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1).  Morales was also convicted of possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)) (count 7).  Morales "stipulated" to having suffered a prior serious or violent felony conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

The trial court sentenced Alvarado to a total term of 12 years in prison, consisting of the low term of two years for the robbery in count 1, plus 10 years for the section 12022.53, subdivision (b) enhancement.  The court imposed the same 12-year sentence to run concurrently in each of counts 2 through 4.  The court imposed a concurrent sentence of one year in count 5 and the midterm of two years in count 6, also to run concurrently.  The court stayed the gang enhancement in all counts.

The trial court sentenced Morales to a total term of 18 years in prison.  In count 1, the court imposed the midterm of three years, doubled to six years pursuant to the Three Strikes law, plus 10 years for the section 12022.53, subdivision (b) enhancement and one year for a prior prison-term enhancement under section 667.5, subdivision (b).   In counts 2, 3, and 4, the court imposed the identical sentence, to run concurrently in each count.  In count 5, the court imposed a consecutive one-year term for the misdemeanor.  In count 6, the court imposed the midterm of two years to run concurrently.  The court

---

[1]      All further references to statutes are to the Penal Code unless stated otherwise.

stayed the gang enhancement on all counts. In count 7, the court imposed the midterm of two years to run concurrently.

Alvarado appeals on the ground that the trial court violated his Sixth Amendment right to effective assistance of counsel when it refused to allow him to discharge his retained attorney.

Morales appeals on the grounds that: (1) the case must be remanded for resentencing because the trial court failed to give him his *Boykin-Tahl*[2] advisements before finding that the prior prison term and prior strike conviction allegations were true; (2) there was insufficient evidence that he participated in the tagging of the restaurant or the church; (3) the instruction for vandalism of religious property that was given to the jury omitted an element of the crime described in section 594.3; (4) there was insufficient evidence that he committed robbery as alleged in count 3; (5) the section 12022.53 gun enhancement is not applicable to count 6; and (6) the trial court did not have discretion to stay the gang enhancements rather than strike them.[3]

Alvarado joins in issue Nos. IV through VII in this opinion as raised by Morales. Morales states that he joins in all issues raised by Alvarado to the extent they benefit him.[4]

## FACTS

**Prosecution Evidence**

At approximately 7:40 p.m. on January 3, 2011, Benjamin S. and his friends Josue, Christopher, and Roberto, all minors, were walking down Westmoreland Avenue, near James M. Wood Boulevard. A car pulled up and cut them off. Benjamin was scared because they were in a bad neighborhood. Morales was in the driver's seat of the car and

---

[2]     *Boykin v. Alabama* (1969) 395 U.S. 238 (*Boykin*). *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*).

[3]     At oral argument, counsel for Morales conceded this issue.

[4]     Alvarado raised only one issue, and that issue is not relevant to Morales's case.

Alvarado was in the passenger seat. Morales asked, "Where are you from?" Benjamin knew this meant Morales wanted to know if he was from a gang, and Benjamin responded that he did not "gangbang or that I'm not from nowhere." The two men seemed mad at something. Benjamin had seen Morales before, just walking around the street, and he remembered his tattoos. Alvarado pulled out a gun and held it outside the car window, pointed down. Morales got out of the driver's seat and approached Benjamin's group looking "madder and madder." Alvarado moved into the driver's seat of the car. Morales said something like, "What do you guys got on you?" Benjamin saw his "friends . . . taking out their stuff." He did not want to surrender his property, but he was afraid, so he gave up his iPod and some earphones. His friends all gave up iPods. Josue at first tried to slip away but Morales saw him. Josue gave Morales "his stuff." Benjamin heard someone say, "Let's go, Peanut." After Morales took their belongings, he got in the passenger seat of the car. Benjamin did not want to call the police and get himself in deeper trouble. He and his friends began walking toward the bus stop. A short time later, they saw a helicopter and heard sirens.

Approximately 20 minutes after the robberies of the four youths, at approximately 8:00 p.m., Officer Nam Phan of the Los Angeles Police Department (LAPD) and his partner noticed two males standing in front of the Yangmani restaurant, located at the intersection of Olympic Boulevard and Magnolia Avenue. One of the males was spray painting graffiti on the wall of the restaurant, while the other stood on the sidewalk. The male on the sidewalk was looking from side to side and appeared to be acting as a lookout. He was tall, "bulkier" than the male who was spray painting, and wearing dark clothing. Alvarado was nearby—sitting in the driver's seat of a blue or teal Toyota Camry. The Camry's front passenger door was open. The two males standing in front of the restaurant ran when the officers approached. The male acting as the lookout ran south. The male who had been spray painting ran toward the Camry, then dropped the spray paint can and ran north.

Officer Phan saw spray-painted graffiti on a building across the street from the restaurant. It was of the same color. The graffiti on both buildings read, "M.S." and

4

"13." The paint on the building across the street from the restaurant was still somewhat wet.

Officer Denward Chin arrived at the scene to assist Officer Phan, who had detained Alvarado. While speaking with Alvarado, Officer Phan saw the "bulkier"-sized male return. Officer Phan identified him as Morales. He was aggressive and combative with the officers. Morales yelled that the Camry belonged to him and he was going to take it. He approached the officers and continued yelling even though he was close to them. Officer Phan asked Morales to step back while they investigated. Morales became more aggressive. He clenched his fists and took a fighting stance. Officer Chin spoke to him and Morales began to calm down. Morales then refused to put his hands on his head and tried to take a swing at Officer Chin. Officer Phan and another officer took Morales to the ground and then into custody. Morales continued to challenge Officer Phan to a fight while he was in the back of Officer Chin's patrol unit.

When Benjamin heard the helicopter and police sirens, he and his friends approached the police activity. Benjamin saw that the police had detained the car the defendants were in when they took his property. Benjamin approached and asked the officers if they would check the car for his property. Benjamin identified his iPod. Benjamin also identified the defendants.

Josue approached the officers with Benjamin and appeared frightened. Josue was afraid to tell them how he knew the detained individuals. He said, "I'm scared. I just want my stuff back." Josue then pointed to the car and said it was the car used to stop him when his iPod was taken. Josue said the people the police had detained were the same people in the vehicle when his property was taken. Josue made a field identification from the back seat of a police car, and he identified Alvarado and Morales. Josue said Alvarado pointed a gun toward Josue's feet and demanded property. Josue also said that he recognized both defendants from the area. Josue told Officer Phan that he initially lied to the defendants and said he did not have anything on him, but he was afraid he would be shot or killed so he gave up his property.

5

Officer Phan found Benjamin's iPod when he searched Alvarado. He found an iPod identified as Roberto's in the center console of the Camry. When Officer Chin removed Morales from his patrol car, he saw two iPods on the floorboard where Morales had been sitting. The iPods belonged to Christopher and Josue. At the police station, officers found a baggie in Morales's shoe. It held 1.91 grams of an off-white powdery substance containing cocaine.

Benjamin was familiar with his friends' iPods and identified the iPods shown in People's exhibit 4 at trial. He matched each iPod with its owner. He recognized each iPod because he often used them. Benjamin did not see Roberto hand over his iPod to Morales.

Nicolas Hernandez, the pastor of the church located across the street from the Yangmani restaurant on Olympic Boulevard, first saw the graffiti identified in People's exhibit 6 on the wall of his church in January 2011. He had not given anyone permission to place the markings on the wall.

Officer Richard Rico is an inmate telephone coordinator for the LAPD, and he retrieved recordings of telephone calls from January 3, 4, and 5, 2011, for jail cell B3. Only Alvarado and Morales were housed in cell B3. The audio recording of the calls was played for the jury, and Detective Matthew Gares, the investigating officer in the case, identified Morales's voice in all three calls. During the first call, Morales told a woman that he had been arrested for robbery. He said he was with "Discipulo." He said he started to fight with the cops and an eight-ball of cocaine was found in his shoe. He said, "But I should be all-right [*sic*] because, I mean, somebody over there might know these kids. I'm gonna send somebody who will talk to 'em." Morales also said it was not "that big of a deal," but he was worried that "these fools" would go to court and "they gonna start adding way more charges." He said, "I'll be all-right baby. I mean . . . this shit ain't nothing." He added, "If anything, I'm gonna get these fools' addresses and names and everything. When I see my lawyer I'll get all the information."

In a second call, Morales spoke with a different woman and told her that he left "the 380" with "Minor." In the third call, Morales told a woman, "I'm gonna try to find

6

out who these fools are homegirl.  And . . . I'm gonna give you their hook-ups."  He said he wanted to "get at these fools or something, . . . or tell 'em we'll, you know, give them 500 bolas of fuckin' . . . or whatever . . . ."

After the January 3, 2011 incidents,  Morales was released on bail.   He approached Benjamin on the street two or three times.  Morales promised Benjamin money and other things for Benjamin to lie in court and say he was using drugs the day of the robberies.  On another occasion, Morales asked Benjamin to talk to his former lawyer and to lie about everything.  Morales wanted Benjamin to say that they were drinking together and doing drugs together that day "so . . . he could get out of court."  Benjamin did what Morales asked and went to see Morales's attorney.  He lied to the attorney, who kept asking him if it was true.  Josue went with him.  Benjamin was promised money, drugs, guns, and a trip to Las Vegas.  Benjamin accepted some crystal meth from Morales.  He felt he had to take something for the deal to be legitimate.  Benjamin did not tell the detective about his interactions with Morales because he thought the promises would be kept and he was scared.  He knew Morales was an active gang member and Benjamin was always in Morales's neighborhood.  He believed that if he lied he would be safe in his neighborhood again.  Benjamin said that certain people whom Morales knew would "mad dog" him, or stare him down, on the streets.  When Benjamin got to court, he changed his mind and did not want to contradict himself and look like a fake.

At trial, Josue testified that he was so drunk on the night of January 3, 2011, that he could not recall "that certain event."  He did not remember why he spoke with police officers.  When asked if he saw anybody in court whom he saw on January 3, 2011, he answered, "Nope."  He was not concerned about testifying.  He did not think anything was taken from him on January 3, 2011, but he thought he got his iPod back at the police station.  Josue remembered meeting with the prosecutor and Detective Gares in March 2011 and admitted saying he did not want to talk to the two defense attorneys because he was scared.  Josue testified on March 10, 2011, but he did not really remember testifying under oath.  He did not recall telling the prosecutor and Detective Gares that he was scared and did not want to have to face the defendants.  He did not recall any of his

7

testimony at the preliminary hearing. He denied that Morales had contacted him and told him to contact Morales's attorney. He did not remember Morales assuring him he would be safe if he said he did not recall the incident and stated, "I honestly don't remember nothing."

Josue also did not recall repeatedly calling the prosecutor's office in April 2011, expressing concern because he heard that Morales had been released back into the community. He said that he and his companions "came up with a fictional story" to get their stuff back when they spoke with police officers on the night of January 3, 2011.

A deputy district attorney who shared an office with the prosecutor in April 2011 testified that she answered the prosecutor's telephone on one occasion because it kept ringing "over and over." A caller with a young male voice indicated he was being threatened. He sounded nervous and fearful.

Detective Gares met with Josue and Benjamin on January 4, 2011, at the Olympic police station. Josue went to the station voluntarily. He appeared to be nervous. He trembled as he spoke and said he was in fear. Josue told Detective Gares that the defendants pulled up in their car and blocked the path of Josue and his three friends on January 3. Morales was driving, and Alvarado was the passenger. Alvarado asked, "Where are you from?" Josue answered that they were not from anywhere. Josue said that Alvarado then brought up a firearm to eye level, and Josue and his friends were in fear. Morales got out of the car and took Josue's and his friends' iPods and other property. Alvarado got into the driver's seat, yelled for Morales to get in, and they drove away with the property.

On January 20, 2011, Detective Gares drove Josue and Benjamin to court because they were not old enough to drive. They were very cooperative but were concerned about testifying. They asked if they could wear disguises in court. On the day of the preliminary hearing, March 10, 2011, the two youths were still cooperative but very scared. The two previous defense attorneys and a defense investigator wanted to meet with them before they testified. Both boys refused to speak with them. One of the attorneys asked where they lived and Detective Gares told the boys not to provide their

8

addresses.  They both testified at the preliminary hearing.  Afterwards, Josue was upset, shaking, and very scared.  He believed he had been recognized in court.  The prosecutor provided Josue with a business card stating the direct telephone line to her office and told him to call if anything happened.  Detective Gares gave Josue his card and cell phone number in the event anything happened.  In the first week of April 2011, the prosecutor called the detective and told him to call Josue right away because he was very scared.

When Detective Gares called Josue, Josue was extremely upset.  He said Morales had been released.  He was worried about his safety.  Josue knew Morales was an MS gang member, "one of the main guys in that area."  Detective Gares told Josue to dial 911 if anything came up and to call the detective if it was not an emergency.

When Detective Gares contacted Josue at a later date about his next court appearance, Josue's attitude had completely changed.  He said, "I don't want to talk about the case.  I don't want anything to do with the case.  I don't want to go to court.  I just want it all to go away, please leave me alone."  Detective Gares asked repeatedly if anything had happened, but Josue just said "No" and that he did not want to talk about it.

On April 30, 2012, when Detective Gares went to pick up Josue and Benjamin for court, Josue refused to go with them.  He said he would "take himself to court," but he did not appear.  Benjamin rode with Detective Gares to court and said he believed he was in danger.  He at first appeared to be fine, but he then saw some individuals in the hallway and began shaking.  He said he had to get out of there.  Detective Gares took Benjamin to another hallway.  Benjamin began to cry and said he was scared.  He said that individuals from the neighborhood who were associated with Morales had "mad-dogged" him on the street.

During a recess in the midst of Benjamin's trial testimony, he told Detective Gares that Morales had approached him after being released from custody.  Morales took Benjamin and Josue to his attorney and told them to make up a story or say they did not remember what happened.  Morales promised them money, trips, drugs, and guns. The detective immediately notified the prosecutor.  It was the first time that the detective and prosecutor had learned of this.  Benjamin told them he felt he had to accept the deal from

9

Morales in order to ensure his safety. He was concerned with being labeled a snitch and getting beaten up. Benjamin told them that he thought about it and decided he did not want to sit on the witness stand and lie and look like a fool.

**Gang Evidence**

Officer Robert Chiu of the LAPD testified as a gang expert. He worked primarily with the Mara Salvatrucha (MS 13) gang. He testified about gang culture in general based on his background, training, and experience. He stated that a gang's reputation is very important to the gang. This meant being feared in the streets and the community. Gang members also gained respect by placing their name up on walls. Officer Chiu identified typical MS gang graffiti.

"Hitting someone up" meant that a gang member asks for another person's gang affiliation, and it was usually done by asking, "Where you from?" After the question was asked, people could be robbed or killed if they were affiliated with a rival gang. A "snitch" was a person who cooperated with or provided information to the police.

The MS 13 gang is aligned with the Mexican Mafia, a prison gang. There were several cliques in the Olympic division, including the Francis Locos. Officer Chiu had investigated numerous crimes involving the gang, including attempted murders, assaults with deadly weapons, robberies, narcotics sales, gun possession, and vandalism.

Morales had "Mara Salvatrucha" tattooed on the back on his neck, "MS" and "XIII" above his eyebrow, "MS" on his chest, "MS" on his back, "FLS" on his knuckles, and tattoos of a devil with horns on his left and right arms. Alvarado had "MS" and "The Francis Locos" tattooed on his abdomen.

Officer Chiu was of the opinion that MS 13 had engaged in a pattern of criminal gang activity. Their primary activities included shootings, murders, robberies, narcotics sales, vandalism, and gun possession. Officer Chiu testified regarding certified records showing that two MS 13 gang members were convicted of attempted murders in 2009.

Morales admitted to Officer Chiu and to other officers that he was a member of MS 13. His moniker is "Peanut." Alvarado had admitted his membership in the MS gang to Officer Chiu also. His moniker is "Disciple." Officer Chiu was familiar with an

10

MS 13 gang member with the moniker "Minor." He was in the same clique as Morales and Alvarado. A ".380" referred to a handgun caliber.

When given a hypothetical situation based on the facts of the case, Officer Chiu expressed the opinion that the robberies would have been committed for the benefit of or in association with a criminal street gang. He based his opinion on the circumstances that the two suspects were well-known, documented MS 13 members in the heart of their territory committing violent acts such as robbing someone's property. The crimes benefit the gang by instilling fear in the victims and the community, which means they can commit more crimes.

Based on another hypothetical, Officer Chiu expressed his opinion that the tagging incident would have been done for the benefit of, at the direction of, and in association with a criminal street gang. The gang members were letting the people know that the area belongs to them. The people were thus less likely to confront them for fear of being retaliated against.

**Defense Evidence**

Roberto Herrera testified that Alvarado had been working full time for his plumbing company since 2006. Alvarado was very hard working and honest. He was given keys to apartments to provide services, and the company never had a problem with him. The company never had any problems with Alvarado with respect to violence. Herrera did not know Alvarado to be a gang member. His opinion would change if he knew Alvarado was an active and documented gang member. His opinion would change if he knew Alvarado and another active gang member pulled out a firearm and robbed four young boys.

Leonard Rivas was a community intervention worker with Aztec Rising. The organization helps people rehabilitate their lives as they transition out of the gang lifestyle. Rivas had been involved with a gang earlier in his life and suffered a forgery conviction in 2002, for which he served a 16-month prison term. He was rehabilitated when he entered a Christian rehabilitation home while on parole. Rivas earned an

11

Associate of Arts degree in Theology. Aztec Rising operates in an area where there are approximately 20 gangs.

Rivas met Morales when he was enrolled as a client of Aztec Rising. Morales enrolled himself in 2009 to obtain "the intervention for the rehabilitation for the transition out" of the lifestyle he was in. Aztec Rising hired Morales in 2010 and 2011 as support staff at Lemon Grove Park and Lafayette Park. Rivas was his boss, and Morales did "a really great job." Morales organized sporting events. He had a stressful job because he was responsible for making sure attendees were engaged and not just hanging out and causing problems in the park. He was a "fairly good employee."

Morales brought over 12 gang members, including MS members, to Aztec Rising as clients. He took risks by referring gang members to Aztec Rising. The gangs want to recruit members and be strong, and Morales was working against the gang. He could have been beaten up, shot or killed.

Rivas believed Morales was responsible, possessed of a good work ethic and a family man who was good to his wife. Rivas's opinion of Morales would not change based on the January 3, 2011 crimes or the fact he was charged with having a gun. Rivas believed Morales might be having some challenges in his rehabilitation, but that would be the extent of it. He believed that Morales had begun the process of removing his tattoos.

**Prosecution Rebuttal Evidence**

By way of rebuttal, the prosecutor and Morales stipulated that, at approximately 11:05 p.m. on November 4, 2011, Officer Velasco saw Morales toss a stainless steel revolver toward an open car door. The officer later determined that the gun was loaded. Morales was in the area of 68th and Hoover Streets, which was an area claimed by the 18th Street gang.

## DISCUSSION

### I. Denial of Alvarado's Request to Discharge Retained Counsel

#### A. *Alvarado's Argument*

Alvarado contends the trial court's determination that the request to discharge retained counsel was untimely was not supported by substantial evidence. The court

failed to conduct a sufficient inquiry to make that finding and failed to balance Alvarado's interest in new counsel against the potential disruption resulting from the discharge. Therefore, the trial court abused its discretion.

### B. Proceedings Below

On October 4, 2011, E.J. Montanez substituted in as counsel for Alvarado, relieving the alternate public defender's office. On May 22, 2012, as the prospective jurors waited outside the courtroom, the trial court discussed in open court an offer it had made to defendants, which consisted of a 12-year sentence for Alvarado and an 18-year sentence for Morales. The court wished to confirm defendants were not interested in the offer. Defendants at first said they were not, but after further discussion, they wished to consider it. The court gave them until the following day to reflect.

The following day, the trial court again offered the indicated sentences. The two defendants vacillated. Finally, after consulting with each other, defendants agreed to accept the offers. Just before pleading guilty, Alvarado learned he would have four strikes as a result of the plea. At that point, Alvarado said he could not accept the offer, and Morales was foreclosed from doing so. The jurors entered the courtroom, and voir dire of the prospective jurors commenced. At the close of voir dire, the court gave Alvarado until the following day to reflect further on the offer.

The next day, Alvarado told the court its offer was "excellent," but he believed it was "too many years." He stated that the offer came from the judge, and his attorney had never tried to get him a better offer or to fight for him. The court informed Alvarado that this was not true, and his attorney had asked for a much better offer and explained to the court the mitigating circumstances. Alvarado said his attorney never wanted to present any motions and told Alvarado he was not going to waste his time on those things. When the prosecutor offered to leave, the court stated it was not going to deem the discussion a *Marsden*[5] motion. Alvarado stated, "I just want to make it clear that at this point my

---

[5]     *People v. Marsden* (1970) 2 Cal.3d 118.

13

family is no longer willing to pay him and if he wants to continue on this case, it will be on his own because my family no longer agreed to pay." Alvarado said his attorney had told him many times "that he can't do anything." The court replied that Alvarado's attorney would represent him to the best of his ability during the trial. Mr. Montanez confirmed that was correct.

Morales's attorney, Mr. Johnson, interjected that Morales would like to accept the offer. He believed both defendants would be found guilty on all counts. He stated, "I think somebody here thinks that they didn't do anything and that therefore some miracle is going to happen. It's not going to happen." He added, "and they think a lawyer is supposed to come in, file some motion and say, 'Rule 32,' and the court is going to say, 'Rule 32, case dismissed.' Well, it doesn't happen." After the court discussed the potential evidence against the defendants, Alvarado stated, "I just want it to be clear that I do not need him. And I'd rather have a state-appointed attorney, not this attorney." The court replied, "All right. At this juncture it is too late. I do not consider the request for substitution of counsel to be timely. Mr. Montanez will continue to represent you. All right. Please have the jury join us." Voir dire resumed.

Alvarado again asked for Montanez to be relieved prior to sentencing, and the trial court acquiesced. The alternate public defender was appointed, who eventually filed a new trial motion in which he argued, inter alia, that Alvarado should have been allowed to discharge Montanez and that the trial court's denial of this request deprived Alvarado of a fundamental right. The court stated, "With respect to [this] assertion, . . . case law is extensive in indicating that while a person certainly has the right to discharge their attorney, it must be done in a timely manner. I have a distinct memory of seeing Mr. Alvarado . . . sitting exactly where Miss Stevens is sitting at the end of counsel table and we were midway through taking a plea when Mr. Alvarado realized that the plea contemplat[ed] him pleading to multiple strike offenses. It was only then that the request was made to discharge his attorney. This was on the very day that the trial was to commence. And so the court's determination that it was an untimely request I think is well taken. It was not a situation where Mr. Montanez, previous counsel, had come into

14

the case only days or weeks before. Mr. Montanez and Mr. Alvarado had an attorney-client relationship for a significant period of time. Mr. Montanez was retained by Mr. Alvarado. He was not a court-appointed attorney. And when Mr. Alvarado indicated that he would not be paying Mr. Montanez for his trial services, I specifically asked Mr. Montanez whether or not that would affect in any way the manner in which he represented Mr. Alvarado. He indicated it would not. Again, the larger context that I consider the motion for new trial on this ground is in light of the overwhelming evidence that I have recited earlier with respect to the second contention.[6] All of those factors taken into consideration prompts this court to respectfully deny the motion for new trial based on the court's determination that would be improper for him to fire his attorney as requested on the very day the trial was to commence."

### C. Relevant Authority

Criminal defendants have the right to dismiss a retained attorney. (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*).) "[W]hen a criminal defendant makes a timely motion to discharge his retained attorney he should not be required to demonstrate the latter's incompetence, as long as the discharge will not result in prejudice to the defendant or in an unreasonable disruption of the orderly processes of justice." (*Id*. at p. 979; *People v. Munoz* (2006) 138 Cal.App.4th 860, 863.) "Certainly, the stage of the proceedings at which the motion is made could affect its timeliness." (*Munoz*, at p. 867.)

### D. No Abuse of Discretion

We believe the trial court properly denied Alvarado's request to relieve his retained counsel. "The right to discharge retained counsel is not absolute . . . and the court may exercise discretion to ensure orderly and expeditious judicial administration if the defendant is 'unjustifiably dilatory or . . . arbitrarily desires to substitute counsel at the time of trial.' [Citations.]" (*People v. Lara* (2001) 86 Cal.App.4th 139, 153.) Mr.

---

**6** Alvarado also argued in the new trial motion that defense witness Ignacio Roberto Herrera did not in fact have a conviction on his record, and the mention of such a conviction at trial led to the jury's likely disregarding his testimony.

Montanez began representing Alvarado on October 4, 2011. The trial court recognized that new counsel would need time to prepare given the serious charges. Over six months later, on May 22, 2012, the trial court spoke to defendants while the jurors were outside in the hallway and again extended its offer of 18 and 12 years to defendants. The offers were refused and voir dire began. On the following day, the vacillation about the court's offer continued until Alvarado's final refusal to plead. Voir dire continued. It was not until the following day, the third day of voir dire, that Alvarado made h B253431 - People v. Valencia (BAF) Wende case submittedis request to discharge Mr. Montanez. Clearly, Alvarado's request was untimely and would result in ""'"disruption of the orderly processes of justice unreasonable under the circumstances of the particular case."'"' (*Id.* at p. 159.)

As noted in *People v. Lau* (1986) 177 Cal.App.3d 473, the condition precedent to consideration of the factors set out in *Ortiz* is that the request for substitution be timely made. (*Lau*, at p. 479, citing *People v. Stevens* (1984) 156 Cal.App.3d 1119, 1127, for the principles later set out in *Ortiz* regarding prejudice to the defendant and disruption of the orderly processes of justice.) In this case, Alvarado was provided with a "fair opportunity" to secure counsel of his choice. (*Ortiz*, *supra*, 51 Cal.3d at p. 983.) As the trial court noted, the case had been pending for almost a year and a half. Given the serious charges, a lengthy continuance would have been necessary in order to appoint new counsel and allow time for counsel to prepare. The trial court properly obtained assurance from Mr. Montanez that he would continue to diligently represent Alvarado.

The record clearly shows that the People's and codefendant's trial preparations were complete, and the witnesses, who had already been subject to extreme pressures from Morales's contacts on the street, were scheduled to appear. The prosecution witnesses at a minimum would have been further inconvenienced and perhaps lost by any further delay, as was eminently demonstrated by Josue's complete recantation of his former statements and testimony at trial. "[T]he 'fair opportunity' to secure counsel of choice provided by the Sixth Amendment 'is necessarily [limited by] the countervailing state interest against which the sixth amendment right provides explicit protection: the

16

interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time."'" (*Ortiz*, *supra*, 51 Cal. 3d at pp. 983-984; *People v. Lara*, *supra*, 86 Cal.App.4th at p. 153.)

Moreover, Alvarado requested and was granted the opportunity to address the court about his reasons for wanting to discharge his attorney. He cited only vague reasons about his attorney refusing to file certain motions Alvarado had requested, such as one regarding the gang allegation. These reasons were hardly persuasive. The trial court properly informed Alvarado that the gang allegation was for the jury to decide. It appeared, as noted by Morales's counsel, that Alvarado expected a motion to free him from the situation in which he found himself. His last request before initially agreeing to accept the offer was for "12 years' joint suspension [presumably a suspended sentence] or anything like that."

The court was not obliged to grant Alvarado's request, made at the eleventh hour, when to do so would necessarily have required a continuance and interfered with the orderly administration of justice. (See, e.g., *People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 [no error in denying last-minute attempt to discharge counsel where request made on day set for trial when case had been pending for over two years, new counsel had neither been identified nor retained, and scheduled witnesses would have been further inconvenienced].) There was no abuse of discretion.

## II. Absence of *Boykin-Tahl* Advisement to Morales

### A. *Argument*

Morales contends the trial court failed to give him the required *Boykin-Tahl* advisements, and there was nothing in the record suggesting he knowingly and voluntarily admitted his prior convictions. Therefore, he argues, the case must be remanded to the trial court so that he may make a voluntary and intelligent decision as to whether to admit his priors or request a jury or court trial on the allegations.

17

### B. Proceedings Below

Prior to jury selection, the trial court asked Morales's counsel, Mr. Johnson, if Morales was inclined to waive jury trial on his prior strike conviction. After consulting with Morales, the following exchange occurred: "Mr. Johnson: In the event there's a conviction on the case, your Honor, I have advised Mr. Morales that he would have the right to a jury trial on a part of the issue as to whether or not the conviction was—prior conviction was sustained, and then the court would decide I believe whether or not he's party. He's willing to waive jury and let the court decide those issues. [¶] The Court: I appreciate that, Mr. Morales, that is often how it is done. But you do have a right for the same jury that makes a determination as to the guilt or innocence as to the charges that are pending to make a decision as to whether or not you have sustained the prior convictions that are alleged. Is it, in fact, acceptable to you that this jury be discharged after they return their verdicts; and should they return a guilty verdict, the People would have to prove to me alone beyond a reasonable doubt that you were convicted of one or more of the priors alleged against you? Is that acceptable to you? [¶] Defendant Morales: Yes. [¶] The Court: Very well. Counsel join? [¶] "Mr. Johnson: Yes."

During the course of pronouncing sentence on Morales, the trial court stated, "The court is not prepared to strike the strike as requested. But the calculus for Mr. Morales would be, given the strike prior—and just so the record is clear, my memory is deficient in this one regard, was that stipulated to?" Both the prosecutor and the court understood that it had been. Mr. Johnson said he did not believe they had stipulated. Mr. Johnson consulted his file and stated that it was a juvenile matter resolved as an adjudication, and he would stipulate to it. The court addressed Morales and stated, "Mr. Morales, your counsel is prepared to stipulate to the prior conviction as a juvenile that has been set forth in the information. Do you concur with that stipulation? Do you agree with it?" After Morales and his attorney conferred, Morales replied, "Yes." The trial court proceeded to sentence Morales.

## C. Relevant Authority

The California Supreme Court set forth the relevant jurisprudence in *People v. Mosby* (2004) 33 Cal.4th 353 (*Mosby*), as follows: "For nearly two decades after our decision in *In re Yurko* [(1974)] 10 Cal.3d 857, lack of express advisement, and waiver, of all three *Boykin-Tahl* rights was viewed as error requiring automatic reversal. [Citations.] Then, in our 1992 decision in *[People v.] Howard* [(1992)] 1 Cal.4th 1132, we revisited the issue and came to a different conclusion. The pertinent inquiry, we said, was whether 'the record affirmatively shows that [the admission] is voluntary and intelligent under the *totality of the circumstances*' [citation], applying 'the test used to determine the validity of guilty pleas under the federal Constitution.' [Citation.] *Howard* explained: '[T]he weight of authority today makes it abundantly clear that "the California interpretation of *Boykin* announced in *Tahl* is not required by the federal Constitution . . . ." [Citations.]' [Citation.] We also said that the United States Supreme Court 'has never read *Boykin* as requiring explicit admonitions on each of the three constitutional rights,' but instead looks to the test set out in *North Carolina v. Alford* [(1970)] 400 U.S. [25] at page 32, which asks '"whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."' [Citation.]" (*Id.* at p. 360.)

"By adopting in *Howard* the federal constitutional test of whether under the totality of circumstances the defendant's admission is intelligent and voluntary, we rejected the rule that 'the absence of express admonitions and waivers requires reversal regardless of prejudice.' [Citation.] In replacing the old rule, the focus was shifted from whether the defendant received express rights advisements, and expressly waived them, to whether the defendant's admission was intelligent and voluntary because it was given with an understanding of the rights waived. After our *Howard* decision, an appellate court must go beyond the courtroom colloquy to assess a claim of *Yurko* error. [Citation.] Now, if the transcript does not reveal complete advisements and waivers, the reviewing court must examine the record of 'the entire proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the

totality of circumstances.  [Citation.]  That approach—reviewing the whole record, instead of just the record of the plea colloquy—was recently endorsed by the United States Supreme Court in a case where a federal court failed, before accepting the defendant's guilty plea, to advise the defendant of his right to counsel as required by rule 11 of the Federal Rules of Criminal Procedure.  [Citations.]"  (*Mosby*, *supra*, 33 Cal.4th at p. 361.)

### D.  Plea Was Voluntary and Intelligent

We believe Morales's case is analogous to *Mosby*.  In that case, the court defined the issue as follows:  "When, immediately after a jury verdict of guilty, a defendant admits a prior conviction after being advised of and waiving only the right to trial, can that admission be voluntary and intelligent even though the defendant was not told of, and thus did not expressly waive, the concomitant rights to remain silent and to confront adverse witnesses?"  (*Mosby*, 33 Cal.4th at p. 356.)  The court determined that the "answer is 'yes,' if the totality of circumstances surrounding the admission supports such a conclusion."  (*Ibid*.)

In *Mosby*, the defendant was charged with one count of selling cocaine, and it was alleged that he had a prior felony conviction.  (*Mosby*, *supra*, 33 Cal.4th at p. 356.)  After learning that the jury had arrived at a verdict, the defendant waived a jury trial on the issue of the prior conviction.  (*Id*. at pp. 357-358.)  When a guilty verdict was delivered, the defendant said he was prepared to admit the prior conviction, and he waived a court trial.  (*Id*. at p. 358.)  The defendant admitted the prior felony conviction.  (*Id*. at p. 359.)  He was not advised of his rights of confrontation and against self-incrimination.  (*Id*. at pp. 357-358.)

*Mosby* examined prior cases on the issue of inadequate *Boykin-Tahl* advisements and separated them into two categories.  First, there were truly silent-record cases, where the record showed "no express advisement or waiver of the *Boykin-Tahl* rights before a defendant's admission of a prior conviction."  (*Mosby*, *supra*, 33 Cal.4th at p. 361.)  Second, there were cases with incomplete *Boykin-Tahl* advisements—cases in which the

20

defendant was advised of his right to a jury trial, but not of the rights to remain silent and to confront witnesses. (*Mosby*, at pp. 362-364.)

With respect to the silent-record cases, *Mosby* concluded the appellate courts were correct in holding that the defendant's admissions were not voluntary and intelligent. "In such cases, in which the defendant was not advised of the right to have a trial on an alleged prior conviction, we cannot infer that in admitting the prior the defendant has knowingly and intelligently waived that right as well as the associated rights to silence and confrontation of witnesses." (*Mosby*, *supra*, 33 Cal.4th at p. 362.)

In the cases where there were incomplete advisements, as in the silent-record cases, the defendants had participated in jury trials and subsequently admitted prior convictions. (*Mosby*, *supra*, 33 Cal.4th at pp. 362-364.) But their admissions were made after they were advised of the right to a jury trial, although not of the rights to remain silent or to confront witnesses. (*Ibid*.) The Courts of Appeal held that the totality of circumstances in those cases did not show the admissions were voluntary and knowing, and the lack of complete advisements required reversal. (*Id*. at pp. 362-364.) *Mosby* disapproved of the incomplete-advisement cases it discussed. (*Id*. at p. 365, fn. 3.)

*Mosby* reasoned that "unlike a trial on a criminal charge, trial on a prior conviction is 'simple and straightforward,' often involving only a presentation by the prosecution 'of a certified copy of the prior conviction along with the defendant's photograph [or] fingerprints' and no defense evidence at all. [Citation.] Here, [Mosby], who was represented by counsel, had *just* undergone a jury trial at which he did not testify, although his codefendant did. Thus, he not only would have known of, but had just exercised, his right to remain silent at trial, forcing the prosecution to prove he had sold cocaine. And, because he had, through counsel, confronted witnesses at that immediately concluded trial, he would have understood that at a trial he had the right of confrontation." (*Mosby*, *supra*, 33 Cal.4th at p. 364.)

*Mosby* also reasoned that a defendant's prior experience with the criminal justice system should be considered as part of the totality of the circumstances. (*Mosby*, *supra*, 33 Cal.4th at p. 365.) Such experience is relevant to a recidivist's knowledge and

sophistication with respect to his or her legal rights. (*Ibid*.) "Under the totality of circumstances," *Mosby* concluded the "defendant voluntarily and intelligently admitted his prior conviction despite being advised and of having waived only his right to jury trial." (*Ibid*.)

In the instant case, Morales was advised of his right to a jury trial. He decided to waive that right. After the jury found Morales guilty on all counts, the court asked if he had admitted or stipulated to the prior conviction. Mr. Johnson recalled that no record had been made of an admission and he and Morales stipulated at that point to the prior conviction after they discussed the issue. Morales had observed his own jury trial on the current offenses, during which he exercised his right to confront witnesses and his right against self-incrimination;

In sum, the record affirmatively shows the admission was voluntary and intelligent under the totality of the circumstances even though Morales was not expressly advised of his rights to confront witnesses and against self-incrimination.

With respect to the allegation that Morales suffered a prior prison term, however, the record reveals that it was never discussed at sentencing, although the trial court imposed a concurrent one-year term for the enhancement. (§ 667.5, subd. (b).) Although we assume the trial court included this allegation in the pretrial discussion when it referred to "one or more" priors, the lack of any mention of it whatsoever when defendant stipulated precludes a finding of a knowing and intelligent admission to this allegation. This is especially true since the record shows that the prior prison term was served for a 2004 conviction for assault whereas the prior strike conviction was a sustained juvenile adjudication for a 1998 robbery. Therefore, remand for retrial on the prior prison term allegation is required. (*People v. Barragan* (2004) 32 Cal.4th 236, 258-259 [retrial is not precluded on a prior conviction allegation reversed for insufficient evidence].)

## III. Sufficiency of the Evidence for Morales's Conviction for Tagging

### A. *Argument*

Morales argues that mere suspicion rather than substantial evidence he was present for the vandalism was not enough to support his conviction. He was never identified as

22

the person acting as lookout near the tagger at the restaurant, and there was no evidence presented regarding what occurred in the time between the robberies and the tagging. He was not arrested in relation to the tagging and was free to leave until he became combative with the officers. He maintains that his conviction must be reversed.

### B. Relevant Authority

"In reviewing a challenge of the sufficiency of the evidence, we apply the following standard of review: '[We] consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt.' [Citations.] The United States Supreme Court has held: '[T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] The standard of review is the same in cases where the prosecution relies primarily on circumstantial evidence. [Citations.] The California Supreme Court has held, 'Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" [Citations.]" (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1430.)

### C. Evidence Sufficient

Officer Phan testified that he saw two male Hispanics in dark clothing standing on the sidewalk, and one of them was spray painting on the wall of the Yangmani restaurant. There was a vehicle parked right next to them with the front passenger door open. The vehicle was later identified as the car Morales and Alvarado had used in the robbery. When the robbery was completed, 20 minutes before the tagging took place, Alvarado drove away with Morales in the passenger seat. Because the car door was open, Officer Phan could see that there was a person, later identified as Alvarado, in the driver's seat of the car, and no one in the passenger seat. Officer Phan observed that the male standing

on the sidewalk who was not tagging was taller and larger, or bulkier, than Officer Phan. He was facing the street with his hand on his waistband underneath his shirt and appeared to be a lookout. When this person and the tagger saw the police, they ran off. Officer Phan got a brief look at the face of the male who was not tagging. During the investigation for vandalism, a bulky male came to the scene and became very aggressive. Officer Phan identified this person in court as Morales. Morales loudly told the officers, "This is my car, I'm here to take it." He made no inquiries as to why the car was involved in the police activity. He later said it was his girlfriend's car. Morales and Alvarado were shortly thereafter identified as the recent robbers.

Although Morales was not detained for vandalism when he first showed up and began claiming the car, Officer Phan believed he was "possibly" involved in the vandalism, even though he did not detain Morales until he became aggressive. Explaining further, Officer Phan believed he looked familiar and he "recognized his face." Based on the physical characteristics of height, weight, and the quick glance Officer Phan had had of the lookout, he believed Morales could have been that person. Also, the spray painter, upon seeing the police, first ran toward the open passenger door of the car that Morales claimed was his. It appeared "that he was in motion to get in" but he hesitated. He then turned and ran away. The police found one spray paint can in the gutter next to the car claimed by Morales and another inside the car—on the passenger-side floorboard. The graffiti on the restaurant and church read, "MS 13" and "Francis Locos," the buildings were in MS 13 territory, and Morales was in the Francis Locos clique of the MS 13 gang. Further circumstantial evidence was provided by the robbery victims, who were robbed only four blocks away approximately 20 minutes earlier by Alvarado and Morales, who were occupying the Camry.

The jury was fully instructed on the offense of vandalism (CALCRIM No. 2900) and on the principles of aiding and abetting (CALCRIM Nos. 400 & 401). In order to prove Morales aided and abetted the tagging, the jury had to find that the perpetrator committed the crime, Morales knew that the perpetrator intended to commit the crime, and before or during the commission of the crime, Morales intended to aid and abet the

24

perpetrator, and in fact did aid and abet the perpetrator, in committing the crime. (CALCRIM No. 401.)

Given the degree of circumstantial evidence, a reasonable jury could have drawn the inference that Morales and Alvarado met up with a third gang member after robbing the four youths and proceeded to aid the tagger in placing graffiti on the restaurant and church in their neighborhood. Whatever other conclusions the jury might have drawn from the evidence, "it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Bean* (1988) 46 Cal.3d 919, 933.) We conclude substantial evidence supported Morales's conviction for vandalism as an aider and abettor.

## IV. Jury Instruction for Vandalism of Religious Property

### A. Argument

Morales argues that the knowledge element of the offense set out in section 594.3, vandalism of religious property, was omitted from the jury instruction on count 6. He adds that there is nothing in the record to suggest Morales actually knew the building across the street from the Yangmani restaurant was a church. Alvarado joins in this argument.

### B. Proceedings Below

In count 6, charging defendants with vandalism of religious property, the jury was instructed with CALCRIM No. 2900, which the trial court read in pertinent part as follows: "To prove that defendant is guilty of this crime, the People must prove that: 1. Defendant maliciously defaced with graffiti or with other inscribed material real property; 2. The defendant did not own the property; and 3. The real property was a church, synagogue, temple, or mosque used regularly for religious services."

The trial court also read CALCRIM No. 2900 for count 5, which charged defendants with misdemeanor vandalism. The instruction was identical to that used in count 6, except that the third element was not read.

25

### C. Relevant Authority

Section 594.3, subdivision (a) provides: "Any person who knowingly commits any act of vandalism to a church, synagogue, mosque, temple, building owned and occupied by a religious educational institution, or other place primarily used as a place of worship where religious services are regularly conducted or a cemetery is guilty of a crime punishable by imprisonment in a county jail for not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170."

### D. Jury Instruction Deficient

Section 594.3, subdivision (a) clearly contains a knowledge element. Under the statute, a defendant must have knowledge that the edifice on which he or she is painting graffiti is religious property. The jury instruction given for count 6 was no different from that given in count 5, for ordinary vandalism. Therefore, the jury instruction lacked an element of the offense, which was not found in any other jury instruction. In the instant case, moreover, although there was testimony from the pastor that the defaced building across the street from the Yangmani restaurant was a church, the record indicates the building was not obviously a place of worship. Deputy Pham testified that the believed the building to be a business.

Respondent agrees with defendants and suggests this court modify the convictions in count 6 to that of misdemeanor vandalism, the same offense charged in count 5. (§ 594, subd. (a).) We agree that the convictions must be modified.

## V. Sufficiency of the Evidence of Robbery in Count 3

### A. Argument

Morales contends that the only evidence that Roberto, the named victim in count 3, was robbed of his iPod was the fact that it ended up in the car driven by Morales and Alvarado. No one saw Roberto give up his iPod, and Roberto did not testify. Morales posits that one of the other youths may have been using Roberto's iPod and it may not have been in Roberto's possession. On this scant evidence, Morales argues, there was only a suspicion that Roberto was robbed. Alvarado joins in this argument.

### B. Relevant Authority

Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

As the jury was instructed in CALCRIM No. 1600, it had to find that the following elements were proved in order to find defendants guilty of robbery: That defendants took property not their own from another person's possession and immediate presence; that the property was taken against that person's will, and that defendants used force or fear to take the property or to prevent the person from resisting, and when defendants used force or fear to take the property, they intended to deprive the owner of it permanently.

Thus, robbery requires that the victim have either actual or constructive possession of the property and that the property be taken from the victim's immediate presence. (*People v. Gilbeaux* (2003) 111 Cal.App.4th 515, 520-521.) Constructive possession exists where an individual who does not own or have immediate physical possession of the property has the right to control the property. (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 497.)

### D. Evidence Sufficient

The testimony and circumstantial evidence were sufficient to support the convictions in count 3. Benjamin testified that he was with Josue, Christopher, and Roberto when Morales and Alvarado cut them off with their car. Morales got out of the driver's seat and approached them, and Benjamin saw his friends "taking out their stuff."

Although Benjamin did not see Roberto give up his iPod, at trial, Benjamin identified all four of the iPods found by police and depicted in People's exhibit 4. He identified Roberto's iPod specifically as one of them. Josue, who testified at trial that he did not recall anything, and whose credibility was soundly impeached with his preliminary hearing testimony, stated at that hearing that he saw the robbers take "Robert F.'s" iPod and his own. He identified the robbers as Morales and Alvarado.

27

Josue was also impeached by Officer Phan's testimony. Officer Phan found what was identified as Roberto's iPod in the center console of Morales's car.

Even apart from Josue's testimony at the preliminary hearing, the fact that Roberto's iPod was found among the stolen iPods after the four young men had been robbed is substantial evidence that Roberto was a victim of robbery. Property is within a victim's immediate presence when it """"is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.'"" [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 955, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) More than one person may be in constructive possession of property simultaneously, and both may be victims of a robbery in which a single item is taken from their possession by force or fear. (See, e.g., *People v. Marquez* (2000) 78 Cal.App.4th 1302, 1308; *People v. Prieto* (1993) 15 Cal.App.4th 210, 215-216; *People v. Clay* (1984) 153 Cal.App.3d 433, 459.) Actual possession is therefore determined by the victim's physical relationship to the property, whereas constructive possession generally depends on the victim's intangible relationship to the property. (*People v. Galoia* (1994) 31 Cal.App.4th 595, 597.)

Under the circumstances of this case, even if Roberto's iPod was in the possession of one of his three friends, Roberto had the right to control it at the same time. (*People v. DeFrance*, *supra*, 167 Cal.App.4th at p. 497.) Were it not for his fear, Roberto could have acted to retain his property. (*People v. Hayes* (1990) 52 Cal.3d 577, 626-627.) Roberto owned the iPod, and the evidence showed beyond a reasonable doubt that Roberto's iPod was taken by Alvarado and Morales from his immediate presence and his actual or constructive possession.

## VI. Count 6 Firearm Enhancement

### A. *Argument*

Morales argues that the firearm enhancement alleged under section 12022.53, subdivision (b) does not apply to a violation of section 594.3, vandalism of religious property in count 6. Alvarado joins in this argument.

### B. *Firearm Enhancement Improper in Count 6*

In addition to the fact that section 594.3 is not among the offenses listed in section 12022.53, subdivision (a), the record shows that a firearm enhancement under section 12022.53 was not alleged against defendants in count 6. Furthermore, the firearm enhancement was not included on the verdict form for count 6 and necessarily was not found true by the jury for that count. The abstracts of judgment, however, show a concurrent term of 10 years in count 6 pursuant to section 12022.53, subdivision (b). The errors must be corrected.

## VII. Staying of Gang Enhancements

Morales argued that the trial court is authorized to *strike* enhancements pursuant to section 186.22, subdivision (g), but it is not authorized to *stay* them. Alvarado joined in this argument. As noted, Morales conceded this issue at oral argument.

"Subdivision (g) of section 186.22 accords the trial court discretion to strike a gang enhancement 'where the interests of justice would best be served. . . .'" (*People v. Sinclair* (2008) 166 Cal.App.4th 848, 855.) *Sinclair* concluded that the trial court was obliged to impose and stay a gang enhancement unless it exercised its discretion to strike the enhancement under subdivision (g) of section 186.22. (*Sinclair*, at p. 855.)

In addition, section 12022.53, subdivision (e)(2) authorizes the trial court to impose and stay the gang enhancement in a count where a firearm enhancement is imposed pursuant to section 12022.53, subdivision (e)(1) and, as in the instant case, no personal use was alleged. (*People v. Sinclair*, *supra*, 166 Cal.App.4th at p. 854.) Therefore, the trial court properly imposed and stayed the gang enhancements in this case.

## DISPOSITION

The judgments are modified to reduce defendants' convictions in count 6 to the lesser included offense of misdemeanor vandalism. The matter is remanded for resentencing in count 6 and for a new trial on Morales's prior prison-term allegation. In all other respects, the judgments are affirmed. The superior court is directed to amend

29

the abstracts of judgment accordingly and to reflect that the section 12022.53, subdivision (b) enhancement was imposed in counts 1 through 4 only.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.