Filed 10/28/21  P. v. Sprague CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HARRY GLENN SPRAGUE,<br><br>Defendant and Appellant. | F080719<br><br>(Tulare Super. Ct. No. PCF353589)<br><br>**OPINION** |

### THE COURT*

APPEAL from a judgment of the Superior Court of Tulare County.  Michael B. Sheltzer, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Before Levy, Acting P. J., Poochigian, J. and Detjen, J.

## INTRODUCTION

Appellant and defendant Harry Glenn Sprague got into a brief argument with the manager of his mobile home park about whether he had to wear a wristband to use the swimming pool and shot both the manager and her husband. He was charged with two counts of attempted murder with firearm enhancements. He pleaded no contest to the charges and admitted the enhancements and pleaded not guilty by reason of insanity. At the jury trial on sanity, one expert testified he was insane at the time he committed the offenses; two experts testified defendant was malingering, he was not insane, and he appreciated the nature and quality of his actions and knew right from wrong when he committed the offenses. The jury found defendant sane. He was sentenced to 14 years to life for the attempted murders plus 50 years to life for the firearm enhancements.

On appeal, defendant contends the trial court improperly imposed a criminal protective order prohibiting contact with the victims because the order was not authorized by any statute. Defendant also contends his defense attorney was prejudicially ineffective for failing to request an ability to pay hearing under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) when the court imposed the restitution fine, fees, and assessments.

We will strike the criminal protective order, order the abstract of judgment corrected, and otherwise affirm.

## FACTS[1]

At the time of the offenses, defendant was 75 years old (born 1942) and lived in a trailer at the Golden Hills Mobile Home Estates trailer park in Porterville. He previously worked as an electrical station operator for the Department of Water and Power.

---

[1] The facts are from the evidence introduced at the jury trial on whether defendant was sane at the time he committed the offenses. Defendant had the burden of proof at the sanity trial by a preponderance of the evidence. (*People v. Elmore* (2014) 59 Cal.4th 121, 141; Pen. Code, §§ 1026, subd. (a), § 25, subd. (b).)

Defendant testified he consulted with a psychologist in 1994 and was diagnosed as being bipolar. He took prescribed medication for a couple of weeks and stopped because it bothered him. He had never been arrested or hospitalized for mental health related issues, but claimed he was fired because of his mental health problems.

Defendant testified that when he started living at the mobile home park, he had problems with residents who reported him for violating strict rules, and believed they were spying and following him around. Defendant resented the enforcement of "draconian" rules and was annoyed by certain residents. Defendant testified he filed about 40 complaints with the police to complain about several residents, including one person who allegedly made threatening comments, but nothing was ever done. Defendant feared that person might shoot him. Defendant kept four firearms in his trailer for self-defense.

**The argument**

On July 17, 2017, defendant decided to use the mobile home park's community swimming pool. He put a handgun in his backpack and rode his bicycle to the pool.

Melissa Williams was the mobile home park's manager, and lived on the property with her husband, Keith. Mrs. Williams testified there had been problems with non-residents using the swimming pool and other facilities and, as a result, she decided to require all residents wear wristbands to distinguish them from trespassers. The rule was not popular with the residents. Mrs. Williams had a contentious relationship with defendant, who disagreed with the wristband rule.

Mrs. Williams arrived at the pool and noticed defendant was not wearing a wristband. She asked defendant to get out of the pool and offered to give him a wristband. Defendant refused and said, " 'You know what you can do with that, right?' " Mrs. Williams asked what he meant, and defendant said she was making it " 'so much worse.' "

3.

Keith Williams saw the exchange and asked defendant not to speak like that to his wife. Defendant was still in the pool and replied, " 'You're making it worse.' "

James Burger, another resident, was in the pool and wearing a wristband. He testified that defendant argued with Mr. and Mrs. Williams about the wristband, and Mr. Williams called defendant a sex offender.

**Defendant shoots the victims**

Defendant got out of the pool, went to his bicycle, and pulled the gun out of his backpack. Mr. and Mrs. Williams saw him get the gun and tried to run away. Mr. Burger testified defendant shot Mr. Williams, and then turned around and shot Mrs. Williams.

Defendant shot Mr. Williams in the back of his right shoulder. Defendant shot Mrs. Williams in the face, and the bullet went through her nose, from right to left.[2]

Mr. Burger testified that defendant looked at him after he shot the victims, but he did not point the gun at him and seemed "strangely calm." Defendant did not appear confused or asleep, and he was not talking to himself. Defendant used a racial slur, and said he was going to shoot the man and "fix him," referring to Mr. Williams.

After she was shot, Mrs. Williams ran across the street and defendant followed her. Mr. Williams told her to go into their home and call the police. Mrs. Williams went inside their residence and defendant followed her into the yard. Mr. Williams walked in another direction to lure defendant way. Mr. Williams became lightheaded, collapsed, and yelled for help.

---

[2] At the sentencing hearing, Mrs. Williams made a victim impact statement and said the bullet fractured her nose and severely impacted her breathing, a bullet fragment entered her eye, and other fragments were in her face. She still had pain and pressure in her face. Mr. Williams stated the bullet could not be removed from his body, and the wound resulted in partial use of his shoulder.

4.

Mr. and Mrs. Williams testified that aside from shooting them, defendant did not engage in any other bizarre behavior, appear unconscious, talk to himself, appear to be sleep walking, or act like he was hearing voices during their encounter with him.

**Other witnesses**

Judy Miranda was inside a trailer, heard loud bangs, and went outside. She saw Mrs. Williams running from the clubhouse area. Defendant followed her and carried a handgun, and he walked in a calm and cool manner. Ms. Miranda called 911.

Daniel Chavarria was outside his trailer and heard the gunshots and screaming. He called 911 and then saw a man riding a bicycle, later identified as defendant. He asked defendant if he heard the gunshots. Defendant made racial slurs and derogatory remarks about shooting a man and woman.

**Defendant's postarrest statements**

Officer Jordan and numerous officers responded to the trailer park on a dispatch about an active shooter, and the residents identified defendant as the suspect. Jordan saw defendant as he was riding the bicycle inside the trailer park. Jordan ordered him to stop, and defendant complied. Defendant was arrested and a revolver was found in his backpack. Defendant was alert and oriented, responded to the officers' commands, and he did not appear delusional or asleep.

Defendant was interviewed by Officer Sokoloff. Defendant said Mrs. Williams was "nuts" and confrontational, and he had to defend himself because they attacked him. Defendant claimed there was a "gang" of older people who tried to control the mobile home park and exclude certain people from using the clubhouse and swimming pool. Defendant said the group dictated unfair rules so they were the only residents who could use the facilities. Mrs. Williams did what they wanted and only let certain people get a wristband to use the pool.

Defendant said Mrs. Williams told him to get out of the pool, and Mr. Williams threatened to run him out of there. Defendant got out of the pool, but Mr. Williams

followed him and called him a child molester. Defendant asked the interviewing officer, "[H]ow much abuse can somebody take?" Defendant said he had been "abused" by other residents and managers for 13 years.

Defendant claimed Mr. Williams was "coming at me," and was going to beat him up, and defendant had to defend himself. Defendant got his handgun from his backpack and "displayed it," but Mr. Williams kept coming at him. Defendant said he fired three shots and claimed not to remember why or how he shot at the victims but said Mrs. Williams got involved because she was nuts and crazy. Defendant said he did not know why he shot them, and he did not follow them. He denied speaking to witnesses after the shooting and making racial slurs about the victims.

Defendant said he took the gun to the pool to defend himself in case he was attacked by Mr. Williams or someone else. Defendant told the officer that he had filed numerous complaints about people at the trailer park, but the police never did anything.

**Defendant's testimony**

At the sanity trial, defendant testified he did not like Mr. and Mrs. Williams. When Mrs. Williams asked him to wear the wristband, he "told her you know what you could do with it." Defendant claimed he wanted to "move the situation along," but they "wanted to fight." He got out of the pool, and Mr. Williams followed him and said he was a child molester, referring to a false claim made against him in 2008.

Defendant was afraid Mr. Williams was going to assault him since he insulted Mrs. Williams. Defendant testified he heard voices that said to "teach them a lesson." He previously heard voices when he was under stress. Defendant admitted he took the gun out of his backpack and shot Mr. and Mrs. Williams. Defendant testified he was not aware he did anything wrong because he believed he was being attacked, and he did not have "the capacity" to know right from wrong. By the time of trial, however, he realized he did something wrong.

Defendant testified that after he fired the shots, he followed Mr. Williams, heard Mrs. Williams scream for help, and realized he did something wrong. He felt he was in a bad dream. Defendant put the gun into his backpack, got on his bicycle, and headed back to his trailer because he knew he was going to be arrested. He admitted that he spoke to Mr. Chavarria and made derogatory remarks and racial slurs about shooting the victims.

Defendant testified that when he was placed on medication in jail, it "leveled everything out" but claimed he struggled to communicate with the mental health experts who examined him, except for Dr. Velosa.

**Defense expert**

Dr. Luis Velosa, a licensed psychiatrist, testified he examined defendant on October 3, 2018. Dr. Velosa was unable to locate any mental health records for defendant. Defendant told Dr. Velosa that he suffered psychiatric problems since he was in his 20s but stopped taking medication because of the side effects and never received any treatment as of the 1990s. Defendant also reported that at the time of the offense, he suffered from "mood swings" and "anger fits" triggered by insomnia. Defendant said he kept guns to protect himself from people who planned to burn down his mobile home.

Defendant described a long period of perceived harassment by the management and said he just could not take it anymore, got his gun, and shot at them. Defendant never claimed self-defense and instead said he felt in a "dreamlike state." After he was arrested, defendant was examined in jail and prescribed "very serious psychiatric medication for his mental problem."

Dr. Velosa testified defendant was credible and not malingering. Dr. Velosa believed defendant suffered from bipolar disorder with psychotic symptoms at the time of the offenses. A person with bipolar disorder who was not medicated would not be able to discern right from wrong. Dr. Velosa testified defendant's untreated bipolar disorder prevented him from understanding the nature or morality of his acts when he committed the crimes.

**Prosecution experts**

Dr. Dorian Hughes, a licensed psychologist, examined defendant on September 13, 2018. Defendant reported symptoms that were inconsistent with his claimed mental state and symptoms, and exaggerated the reasons for his actions, such as saying he almost committed a mass murder. Defendant's claimed lack of sleep was inconsistent with auditory hallucinations. Defendant showed reasonable awareness of what he did because he described his frustration with the rules, his argument with Mr. and Mrs. Williams, and his reaction of grabbing his gun and shooting them. His actions were not premised on delusions, he did not describe a manic episode, and he gave inconsistent excuses that he was hearing voices and also defending himself.

Dr. Hughes testified defendant had a high score on a malingering test that indicated he was feigning symptoms. She believed defendant had an unspecific mood disorder and not a mental illness, and defendant was sane, appreciated the nature and quality of his actions, and knew right from wrong at the time he committed the offenses.

Dr. Tricia Busby, a licensed psychologist, examined defendant on March 22, 2019, and testified he reported auditory hallucinations and depression. She believed he suffered from schizoaffective disorder and was bipolar, but testified defendant was sane at the time of the offenses. Defendant described having coherent conversations with the victims, deliberate actions leading to the offense, and a rational explanation that he believed he was being attacked. Defendant described hearing a voice as an internal thought, whereas a psychotic person would hear an external voice. Dr. Busby testified that defendant scored high on the malingering test and "overacted" his symptoms.

## PROCEDURAL BACKGROUND

On December 8, 2017, an information was filed in the Superior Court of Tulare County charging defendant with counts 1 and 2, attempted murder of K.W. and M.W.

8.

(Pen. Code, §§ 664, 187, subd. (a)),[3] with enhancements for both counts that he personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (*id*., subd. (c)), and personally used a firearm (*id*., subd. (b)).

On December 11, 2017, defendant pleaded not guilty, and the criminal protective order remained in effect.

**Competency finding**

On February 1, 2018, defense counsel advised the court that there was a doubt as to defendant's competency. The court suspended criminal proceedings and appointed Dr. Middleton to examine defendant. Dr. Middleton reported defendant said he had been previously diagnosed with schizophrenia, but found he was competent to stand trial.

On May 14, 2018, defendant requested a bench trial on his competence to stand trial. On July 12, 2018, the court held the trial, found defendant competent, and reinstated criminal proceedings.

**Guilty and insanity pleas**

On August 17, 2018, defendant pleaded not guilty, and not guilty by reason of insanity. The court appointed Drs. Velosa and Hughes to examine defendant. On December 7, 2018, the court granted defendant's motion for another expert and appointed Dr. Busby.

On October 18, 2019, defendant pleaded no contest to the two counts of attempted murder and the firearm enhancements, and again pleaded not guilty by reason of insanity.

**Sanity verdict and sentencing**

On November 4, 2019, defendant's jury trial on sanity began.

On November 8, 2019, the jury found defendant sane.

---

[3] All further statutory citations are to the Penal Code unless otherwise indicated.

On December 10, 2019, the court conducted the sentencing hearing and imposed an aggregate term of 64 years to life for counts 1 and 2, based on two consecutive terms of seven years to life for the attempted murder convictions plus 25 years to life for the firearm enhancements.[4]

The court ordered defendant to pay a restitution fine of $10,000 (§ 1202.4, subd. (b)) and suspended the parole revocation fine of $10,000 (§ 1202.45).

The court ordered defendant to pay victim restitution of $6,500 to Mr. Williams and $54,262 to Mrs. Williams (§ 1202.4, subd. (f)); and $24,884.64 to the victim compensation board (*id*., subd. (f)(2)). Defense counsel stipulated to the victim restitution amounts.

The court also imposed court operations assessments of $80 (§ 1465.8) and criminal conviction assessments of $60 (Gov. Code, § 70373).

The court found defendant did not have the ability to repay the costs of representation since he was being sentenced to state prison (§ 987.8).

The prosecutor requested the court reissue the criminal protective orders that had been imposed when defendant was arraigned in this case. The court stated the orders would be issued under the previous terms and served defendant with criminal protective orders pursuant to section 136.2, subdivision (i)(1), prohibiting contact with Mr. Williams and Mrs. Williams for three years.

On February 4, 2020, defendant filed a timely notice of appeal.

## ISSUES

### I. The Protective Orders Must be Stricken

Defendant contends the court lacked authority to impose protective orders at the sentencing hearing under section 136.2, subdivision (i)(1) or any other statutory

---

**4** The abstract of judgment erroneously states that the court stayed the terms of 25 years to life for the firearm enhancements.

provision. The People agree the court lacked statutory authority to impose any protective orders in this case.

We first note that while defendant did not object to the protective order at the sentencing hearing, this issue is cognizable despite his failure to object because a claim that a criminal protective order imposed as part of a sentence is unauthorized may be raised for the first time on appeal and is subject to judicial correction whenever the error comes to the attention of the reviewing court. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 995 (*Robertson*); *People v. Ponce* (2009) 173 Cal.App.4th 378, 381–382.)

When defendant was arraigned, the court imposed a criminal protective order pursuant to section 136.2, subdivision (a)(1), which authorizes the court to issue a protective order to protect a victim or witness in a criminal matter during the pendency of a criminal action. Once defendant is convicted and sentenced, however, the court's authority to issue a protective order under subdivision (a) generally ends. (*Robertson, supra*, 208 Cal.App.4th at p. 996; *People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 465; *People v. Stone* (2004) 123 Cal.App.4th 153, 158.)

At the sentencing hearing, the court herein relied on section 136.2, subdivision (i)(1) to impose the protective orders, but this statute only applies when the defendant has been convicted of a crime involving domestic violence and was inapplicable to this case. (*People v. Beckemeyer, supra*, 238 Cal.App.4th at pp. 465–467.)

As the parties agree, numerous statutes authorize imposition of protective, stay-away, or no-contact orders when defendants are convicted of certain offenses, or placed on probation or released on parole, but none of these statutes are applicable to this case. (See *Robertson, supra*, 208 Cal.App.4th at p. 996; § 273.5, subd. (j) [domestic violence]; § 646.9, subd. (k) [stalking]; § 1203.1, subd. (i)(2) [defendant convicted of sexual offense and placed on probation]; § 1201.3, subd. (a), § 1202.05 [defendant convicted of sexual

offense on minor victim]; § 1203.097 [defendant convicted of domestic violence and placed on probation]; §§ 422.55, 422.85, 422.88 [hate crimes]; § 3053.2 [domestic violence parolee]; § 3053.4 [hate crimes parolee]; §§ 3053.6, 3053.8, 3053.9 [sex offender parolee]; see also Code Civ. Proc., § 527.6, subd. (d) [temporary restraining order for harassment].)

The People cite language in *Ponce*, that the court may have "inherent authority" to impose protective orders to protect victims not otherwise covered by statute but concede there is insufficient evidence to support such an order in this case. "Where the Legislature authorizes a specific variety of available procedures, the courts should use them and should normally refrain from exercising their inherent powers to invent alternatives. [Citation.] [¶] Moreover, even where a court has inherent authority over an area where the Legislature has not acted, this does not authorize its issuing orders against defendants by fiat or without any valid showing to justify the need for the order. [Citation.]" (*People v. Ponce, supra,* 173 Cal.App.4th at p. 384.)

As the People concede, the prosecutor did not make an offer of proof or any argument to justify the need for the court to reissue the protective order, particularly given the lengthy prison sentence imposed in this case. (See, e.g., *People v. Stone, supra,* 123 Cal.App.4th at pp. 160–161.) "[A] prosecutor's wish to have such an order, without more, is not an adequate showing sufficient to justify the trial court's action. [Citation.]" (*People v. Ponce, supra*, 173 Cal.App.4th at pp. 384–385; *Robertson, supra,* 208 Cal.App.4th at pp. 995–996.)

The criminal protective orders issued pursuant to section 136.2, subdivision (i)(1) must be stricken.

## II.     The Restitution Fine and Fees

Defendant next argues that defense counsel was prejudicially ineffective for failing to raise an ability to pay objection based on *Dueñas* when the court imposed the

maximum statutory restitution fine of $10,000, the fees and assessments of $80 and $60, and the total of $85,646.64 in victim restitution at the sentencing hearing.

"To show ineffective assistance, defendant must show that 'counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Woodruff* (2018) 5 Cal.5th 697, 761–762.)

*Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1164, 1167.)[5]

We first note that to the extent defendant is challenging the victim restitution orders, defense counsel stipulated to the amounts imposed. More importantly, *Dueñas* specifically stated that it was not addressing victim restitution (*Dueñas, supra,* 30 Cal.App.5th at p. 1169), and the ruling in that case has not been extended to victim restitution orders. (*People v. Evans* (2019) 39 Cal.App.5th 771, 777; *People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 859; *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338; *People v. Allen* (2019) 41 Cal.App.5th 312, 321, 326.)

As for the restitution fine and fees, as we explained in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), we believe *Dueñas* was wrongly decided and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. (*Aviles, supra*, 39 Cal.App.5th at pp. 1068–1072.) Under that standard, the fines and fees

---

[5] The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

imposed in this case are not grossly disproportionate to defendant's level of culpability and the harm he inflicted, and thus not excessive under the Eighth Amendment. (*Id.* at p. 1072.)

Even if counsel was ineffective for failing to object, any error under *Dueñas* is necessarily harmless and not prejudicial because defendant has the ability to pay the fines, fees, and assessments over the course of his prison sentence. (*Aviles, supra*, 39 Cal.App.5th at pp. 1075–1077.) " ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody. [Citation.]' [Citations.]" (*Aviles, supra*, 39 Cal.App.5th at p. 1076.)

There is nothing in the record to show that defendant would be unable to satisfy the restitution fine and fees imposed by the court while serving his prison term, either from prison wage or monetary gifts from family and friends. (*People v. Potts* (2019) 6 Cal.5th 1012, 1055–1057; *People v. Lewis* (2009) 46 Cal.4th 1255, 1321; *Aviles, supra*, 39 Cal.App.5th at p. 1076; *People v. Ellis* (2019) 31 Cal.App.5th 1090, 1094; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.) Moreover, as defendant concedes, the record shows he had some assets, including his mobile home, four firearms, and cash, and he mentioned the existence of a pension.

Finally, contrary to defendant's argument, the court's decision not to order reimbursement of the costs of representation is inapposite to any ability to pay determination for fines and fees. The court's reimbursement finding was based on the statutory presumption contained in section 987.8, that a defendant sentenced to more than one year in prison does not have the ability to reimburse defense costs. This statutory

14.

presumption does not apply to whether defendant has the ability to pay a restitution fine and fees. (§ 987.8, subd. (g)(2)(B); *Aviles, supra*, 39 Cal.App.5th at pp. 1074–1075; *People v. Rodriguez* (2019) 34 Cal.App.5th 641, 646.)

We thus conclude defense counsel's failure to object was not prejudicial.

## III. Correction of Abstract of Judgment

At the sentencing hearing, the court imposed two consecutive terms of seven years to life for the attempted murder convictions, plus two consecutive terms of 25 years to life for the firearm enhancements, for an aggregate term of 64 years to life.

The parties agree the abstract of judgment stated defendant's sentence was two consecutive terms of 32 years to life for counts 1 and 2. The abstract listed both firearm enhancements pursuant to section 12022.53, subdivision (d), but an "S" was erroneously inserted next to the firearm enhancements to indicate the terms were "stayed."

The abstract of judgment must be corrected to remove the "S" and clarify that defendant was sentenced to two consecutive terms of 25 years to life for both firearm enhancements attached to counts 1 and 2.

## DISPOSITION

The criminal protective orders issued pursuant to section 136.2, subdivision (i)(1) are stricken.

The abstract of judgment is ordered corrected to remove the notation that the section 12022.53, subdivision (d) firearm enhancements were "stayed" and to clarify that defendant was sentenced to consecutive terms of 25 years to life for the enhancements attached to counts 1 and 2.

In all other respects, the judgment is affirmed as modified. The trial court shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment.

15.